## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW MEXICO

In re:

**RALPH LEO BRUTSCHE,**

     **Debtor.**                               No. 7-11-13326-SH

---

Yvette Gonzales, Chapter 7 Trustee,

     Plaintiff,                         Adversary No. _____

vs.

SANTA FE SUMMIT HOMEOWNERS' ASSOCIATION, INC.,
a New Mexico non-profit corporation,

     Defendant

## COMPLAINT TO DETERMINE VALIDITY, EXTENT, AND ENFORCEABILITY OF LIENS AND FOR DECLARATORY JUDGMENT

Plaintiff Yvette Gonzales, Chapter 7 Trustee ("Plaintiff"), by and through her attorneys, the Giddens, Gatton & Jacobus, P.C., for her Complaint, STATES:

I.

## PARTIES, VENUE AND JURISDICTION

1. Plaintiff Yvette Gonzales is the Chapter 7 Trustee ("Plaintiff")of the Bankruptcy Estate of Ralph L. Brutsche ("Debtor").

2. Defendant Santa Fe Summit Homeowners' Association, Inc., ("Defendant HOA") is a domestic, non-profit corporation, with its principal place of business in Santa Fe, Santa Fe County, New Mexico.

3. This is a core proceeding over which this court has jurisdiction under 28 U.S.C. § 157(b).

4. Plaintiff files this complaint pursuant to the provisions of the Federal Rule of Bankruptcy Procedure § 7001.

5. Plaintiff seeks to have this Court determine the validity, extent, and enforceability of any liens claimed by the Defendant HOA, and further requests a declaratory judgment that the liens are not valid against the properties of the estate described as:

> Lots 75-A and 76-A, Santa Fe Summit, Phase VI, as shown and depicted on that certain plat of survey recorded in the records of the Santa Fe County Cerk in Plat Book 521, Pages 015;

> Lot 79A-1, Santa Fe Summit, Phase VI, as shown and depicted on that certain plat of survey recorded in the records of the Santa Fe County Clerk in Plat Book 516, Page 001;

> Lots 80A and 84-A, Santa Fe Summit, Phase VI, as shown and depicted in that certain plat of survey recorded in the records of the Santa Fe County Clerk in Plat Book 513, Page 019;

> Lot 82-A, Santa Fe Summit, Phase VI as shown and depicted in that certain plat of survey records of the Santa Fe County Clerk in Plat Book 514, Page 037.

Hereafter ("The Real Properties"), and a declaratory judgment that Plaintiff is a successor to the Declarant under the CCRs (as hereinafter defined), and that Defendant HOA may not make any assessments against the Real Properties so long as Plaintiff is the owner thereof.

## GENERAL ALLEGATIONS

6. On July 22, 2011, Debtor filed a voluntary Chapter 11 proceeding (the "petition date") which was converted by Court Order to a Chapter 7 proceeding on June 8, 2012.

7. Plaintiff is the duly appointed Chapter 7 Trustee of the estate herein.

8.     Ralph L. Brutsche ("Debtor") is a Declarant under that certain Consolidated Declaration of Restrictive Covenants Santa Fe Summit Phases I, II, IV, V, VI, and Tesuque Creek (the "CCRs") dated July 9, 2009. A true and correct copy of the CCRs is attached hereto as Exhibit "A."

9.     Article II, Section 2.A. of the CCRs states that "Declarant shall not pay any Assessments on any lots owned by Declarant or by a successor entity which Declarant controls."

10.    On or about May 11, 2010, Debtor purported to transfer by Warranty Deed ("Deed") to his wife, Janice Brutsche ("J. Brutsche"), as her sole and separate property, ten separate lots of property, Lots 52-A, 60, 78, 75-A, 76-A, 79-A1, 79-A2, 80-A, 84-A and 82-A (the "Ten Lots"). The Deed to J. Brutsche was recorded on May 11, 2010, as Instrument No. 1598545, in the Records of Santa Fe County, New Mexico.   A true and correct copy of the Deed to J. Brutsche is attached hereto as Exhibit B.

11.    On information and belief, at or near the time of the conveyance of the Ten Lots to J. Brutsche, Debtor executed a document in which he designated J. Brutsche a Declarant under the CCRs and as Debtor's successor in title.   A copy of this document is attached hereto as Exhibit "C."

12.    On or about December 2, 2010, Debtor, acting as Grantor and as Trustee of the Ralph L. Brutsche Revocable Trust u/t/a 11-24-89 ("the Trust') signed an Agreement (the "Agreement") which assigned the "separate property" membership interest of the Trust in R.J. Property Holdings, LLC ("R.J. Property"), to J. Brutsche[1]. A true and correct copy of the Agreement dated December 2, 2010, is attached hereto as Exhibit "D".

---

[1] The 2010 tax return for R. J. Property Holdings, LLC state the Ralph L. Brutsche Revocable Trust u/t/a 11-24-89 owned 99% interest in R. J. Property Holdings, LLC and Janice Brutsche owned 1%.

13.     A second version of the Agreement, dated "January ___, 2011 [sic.]" was signed by J. Brutsche and Debtor, which mirrors the text of the December 2, 2010, Agreement but adds a provision that states "Janice paid all of the 20_____ [sic.] property taxes on land owned by R.J." (the "Second Agreement")  A true and correct copy of the Second Agreement, is attached hereto as Exhibit "E".

14.     Seven months after the Second Agreement was executed the Debtor filed this Chapter 7 bankruptcy case on July 22, 2011 (Doc. 1).

15.     The Deed to The Real Properties (Ex. B), and the Assignment of the Trust's interest (the "Assignment") (Ex. D and E) were given to J. Brutsche by Debtor without consideration, and within two years before the date of filing of the petition.

16.     At some point after Debtor transferred The Real Properties to J. Brutsche, Defendant HOA began assessing fees on the lots.

17.     These fees were not paid and resulted in the present lien or liens on the Real Properties claimed by Defendant HOA.

18.     Plaintiff filed an adversary proceeding in this Court to avoid the above-described transfers to J. Brutsche, styled *Yvette J. Gonzales, Chapter 7 Trustee v. Janice A. Brutsche, Adversary No. 13-01046* (the "J. Brutsche Adversary Proceeding").

19.     A Stipulated Judgment Avoiding Transfers in Adversary Case Against Defendant Janice A. Brutsche was entered October 22, 2015 (Doc. No. 35) ("Stipulated Judgment") in the J. Brutsche Adversary Proceeding.

20.     The Stipulated Judgment ordered that the transfers of the Ten Lots, (which include the Real Properties) and the transfer of the Debtor's ownership in R.J Properties to J.

Brutsche are avoided and are preserved for the benefit of the estate. A copy of the Stipulated Judgment is attached hereto as Exhibit "F."

21.     Because Debtor designated J. Brutsche a Declarant and a successor in title, no HOA assessments should have been charged against the Ten Lots while J. Brutsche was in title thereto.

22.     By operation of law, Plaintiff, as the Chapter 7 Trustee for Debtor's estate, is the successor in interest to all ownership and all rights the Debtor had in the Ten Lots and the Real Properties. The Plaintiff now stands in the shoes of Debtor and as the successor to Debtor's interests as Declarant under the CCRs, is not subject to any assessments against the Ten Lots or the Real Properties.

23.     The CCRs provide that in litigation relating to assessments against lots subject to the CCRs, the prevailing party shall recover its reasonable attorney's fees.

## COUNT 1 – DECLARATORY JUDGMENT

24.     Plaintiff re-incorporates and re-alleges the preceding paragraphs of this Complaint as if fully set forth herein.

25.     Defendant HOA alleges that it has valid liens against The Real Properties, an allegation which Plaintiff denies.

26.     Plaintiff asserts that Defendant HOA does not have valid liens against The Real Properties due to the fact that homeowner's assessments against The Real Properties are expressly prohibited by the CCRs with respect to lots owned by a Declarant.

27.     An actual controversy exists between Plaintiff and Defendant HOA regarding the Claim of Lien herein described and Defendant HOA's imposition of assessments, late fees,

interest and other charges upon the Real Properties of which Plaintiff is the owner as successor in title to Debtor.

28.     With respect to the Real Properties, the Court should declare the rights, status and relevant legal relations of the parties.

## COUNT 2 – EXTENT, VALIDITY AND ENFORCEABILITY OF LIENS

29.     Plaintiff re-incorporates and re-alleges the preceding paragraphs of this Complaint as if fully set forth herein.

30.     Plaintiff is the successor by operation of law to all interests of Debtor in and to the Real Properties.

31.     Because the CCRs provide that no lot owned by a Declarant shall be liable for assessments and other charges that may be assessed by Defendant HOA, the liens asserted by Defendant HOA are not valid as against the Real Properties and are, therefore unenforceable.

WHEREFORE, Plaintiff prays for judgment as follows:

a.     For a declaratory judgment that any and all liens recorded against The Real Properties by Defendant HOA are invalid and unenforceable;

b.     For a declaratory judgment that Plaintiff is a successor to the Declarant under the CCRs, and that Defendant HOA may not make any assessments against the Real Properties so long as Plaintiff is the owner thereof;

c.     For judgment providing that the liens claimed by Defendant HOA are not valid and directing Defendant HOA to release any and all liens and claims against the Real Properties;

d.     To award Plaintiff's reasonable attorney's fees and the costs of this action; and,

e.     For such other relief as the Court deems appropriate.

Respectfully Submitted,

Giddens, Gatton & Jacobus, P.C.

/s/George "Dave" Giddens
Submitted Electronically 3/15/16
10400 Academy, Suite 350
Albuquerque, NM 87111
(505) 271-1053
Fax: (505) 271-4848
dave@giddenslaw.com
*Attorneys for Chapter 7 Trustee Yvette Gonzales*

## CONSOLIDATED DECLARATION OF RESTRICTIVE COVENANTS
## SANTA FE SUMMIT PHASES I, II, IV, V, VI, and TESUQUE CREEK

This Consolidated Declaration of Restrictive Covenants ("Consolidated Declaration") is made this 9th day of July 200 9, by Summit Properties, Inc., a New Mexico corporation ("**Declarant Summit Properties**"), by North Hill Development Co., a New Mexico corporation ("**Declarant North Hill Development Co.**"), and Ralph L. Brutsche, individually and as Trustee of the Ralph L. Brutsche Revocable Trust u/t/a dated September 21, 1989, as amended ("**Declarant Brutsche**"). All of the above-identified parties are referred to collectively in the singular as the "**Declarant.**"

### RECITALS:

**WHEREAS**, Declarant Summit Properties and Declarant Brutsche previously recorded those certain declarations of restrictive covenants as follows:

#### Santa Fe Summit Declarations of Restrictive Covenants

Phases I, II and III:

Second Amended Declaration of Restrictive Covenants, recorded at Book 930, Pages 123 through 145 of the Santa Fe County Records, as shown on the plat of survey recorded in the records of the Santa Fe County Clerk's office as Document Number 743,782, at Plat Book 225, Pages 031-032;

Phases IV, V and VI:

First Amended and Restated Declaration of Restrictive Covenants, recorded at Book 1587, Pages 162 through 194 of the Santa Fe County Records, as shown on the plat of survey, recorded in the records of the Santa Fe County Clerk's office as Document Number 944,040, at Plat Book 333, Pages 029-034;

**WHEREAS**, Declarant North Hill Development Co. and Declarant Brutsche previously recorded those certain declarations of restrictive covenants as follows:

#### Tesuque Creek Covenants:

Declaration of Restrictive Covenants recorded at Book 2219, Page 977, Book 2220, Page 007 of the Santa Fe County Records, as shown on the plat of survey recorded in the records of the Santa Fe County Clerk's office as Document Number 1225,751, at Plat Book 513, Pages 001-006;

**WHEREAS**, all of the aforesaid declarations are referred to as the "Original Declarations"; and

**WHEREAS**, Declarant files this Consolidated Declaration to amend, restate and supersede the Original Declarations for the purposes of (a) consolidating all of the covenants for Santa Fe Summit (Phases I, II, IV, V, and VI) and Tesuque Creek into a single comprehensive, internally consistent document, and (b) providing for a method to maintain all the infrastructure serving the Subdivision (as defined below); and

**WHEREAS**, Declarant desires that the Property (as defined below) be encumbered by the covenants and restrictions set forth in this Consolidated Declaration for the benefit of the owners of lots within the Subdivision; and

EXHIBIT

**WHEREAS,** Declarant intends that owners within Tract A-1 and Phase III shall not be members of the Association nor subject to the terms of these Consolidated Covenants; and

**WHEREAS,** Declarant shall record separate covenants that apply to Phase III and Tract A-1; and

**WHEREAS,** Declarant by this Declaration does not desire or intend to subject any other real property which Declarant owns or hereafter acquires to this Declaration, and Declarant does not desire or intend to provide that this Declaration shall be enforceable by parties other than those who are specifically and expressly identified herein; and

**WHEREAS,** Declarant expressly provides that Phases VII, VIII of Santa Fe Summit and all real property known as High Summit, or land contiguous thereto or involved therein, are not encumbered by this Declaration.

## DECLARATION:

**NOW, THEREFORE,** Declarant declares that the Property shall be held, sold, occupied and conveyed subject to the following easements, restrictions, covenants, limitations and conditions, for the purpose of protecting the value and desirability of the Property, and for the purpose of binding all parties having any right, title, or interest in the Property or any part thereof, their heirs, successors, and assigns. Further, Declarant hereby declares that this Consolidated Declaration supersedes in all respects the Original Declarations, which Original Declarations shall no longer be of any force and effect.

### ARTICLE I
### Definitions

The following definitions shall apply wherever the terms appear in this Consolidated Declaration.

A. **"Association"** means the Santa Fe Summit Homeowners' Association, Inc., a New Mexico non-profit corporation, its successors and assigns, which corporation has been formed in accordance with the Original Declarations. The Amended and Restated Articles of Incorporation and the First Amended Bylaws of the Association shall be referred to as the **"Articles of Incorporation"** and the **"Bylaws"** respectively, as the same may be amended. The Association shall be comprised of members that own property in Phases I, II, IV, V, VI or Tesuque Creek Subdivision.

B. **"Association Rules and Regulations"** means the rules, regulations and policies adopted by the Board of Directors, as the same may be amended from time to time.

C. **"Board of Directors"** means the Board of Directors of the Association.

D. **"Charges"** means all General and Special Assessments, Lot Assessments and other charges made by the Association.

CONSOLIDATED DECLARATION OF RESTRICTIVE COVENANTS SANTA FE SUMMIT 2007          Page 2

Case 12-01279-j   Doc 2   Filed 09/10/12   Entered 09/10/12 16:28:23 Page 2 of 32
Case 16-01018-sh   Doc 1   Filed 03/15/16   Entered 03/15/16 17:14:41 Page 9 of 54

E. **"Common Area"** or **"Common Areas"** means all real and personal property owned and acquired by deed after its formation by the Association which is intended for the common enjoyment of the Owners of property within the Subdivision.

F. **"Roads"** or **"Road"** or "Streets" means all roads, whether private or public, located within Phases I, II, IV, V, VI, and Tesuque Creek, excluding Owners' driveways.

G. **"Declarant"** means the parties identified above as Declarant.

H. **"Consolidated Declaration"** means this Consolidated Declaration of Restrictive Covenants.

I. **"General Assessment"** means the annual general assessment made by the Association in accordance with the Consolidated Declaration, shared equally by all owners of platted lots within the Property, with the exception of Lots 9 and 10 in Tesuque Creek (so long as the Owner(s) of such Lot(s) is a "HOP property owner" as defined in the City of Santa Fe Housing Opportunity Program) and any lots owned by the Declarant, as further provided in Article V, and elsewhere in this Consolidated Declaration.

J. **"House"** or **"Homes"** means any residential dwelling constructed or to be constructed on a platted lot, and includes a garage(s) whether attached or detached.

K. **"Enclosed Area"** means any portion of a Yard that is shielded by reason of a privacy wall from the view of adjoining lots or Roads.

L. **"Living Space"** means any heated space within any residential dwelling.

M. **"Member"** means those persons who are members of the Association as provided in Article V, Section 9 of this Consolidated Declaration.

N. **"Mortgage"** means any bona fide first mortgage encumbering a platted lot as security for the performance of an obligation. "Mortgagee" is the holder of a bona fide Mortgage.

O. **"Owner"** or **"Owners"** means the Owner, whether one or more persons or entities, of the fee simple title to any platted lot as shown on the records of the Santa Fe County Clerk. Owners shall not include those having an interest merely as security for the performance of an obligation.

P. **"Lot"** or **""lots"** generally means platted residential lots as shown on the surveys for Phases I, II, IV, V and VI of Santa Fe Summit, and Tesuque Creek referenced above in the Recitals, as the same may be amended from time to time, which are intended as a site for a House. Lots combined into a single lot shall be considered a single lot after such combination.

Q. **"Property"** means that certain real property located in Santa Fe County, New Mexico known as:

> (1) Phases I and II of Santa Fe Summit, currently consisting of twenty lots known as Lots 1 through 5, 10 through 15, 16-A, 18 through 23, 24-A and 26 (hereinafter referred to as **"Phases I and II"**);

CONSOLIDATED DECLARATION OF RESTRICTIVE COVENANTS SANTA FE SUMMIT 2009          Page 3

Case 12-01279-j   Doc 2   Filed 09/10/12   Entered 09/10/12 16:28:23 Page 3 of 32
Case 16-01018-sh   Doc 1   Filed 03/15/16   Entered 03/15/16 17:14:41 Page 10 of 54

(2) Phase IV of Santa Fe Summit, currently consisting of 19 lots known as Lots 27 through 29, 30-A, 32 through 40, 43, 44, 45-A, 47, 48, and 52-A (hereinafter referred to as **"Phase IV"**);

(3) Phase V of Santa Fe Summit, currently consisting of 23 lots known as Lots 41, 42, 49, 50, 51-A, 53, 55through 59, and 61 through 72 (hereinafter referred to as **"Phase V"**);

(4) Phase VI of Santa Fe Summit, currently consisting of 14 lots known as Lots 60, 73 through 78, 79-A1, 79-A2, and 80 through 84 (hereinafter referred to as **"Phase VI"**);

(5) Tesuque Creek, currently consisting of 14 lots known as Lots 1-A, 2-A, 3-A and 5 through 15 (hereinafter referred to as **"Tesuque Creek"**); and

(6) all of the open spaces within the Common Areas, all as shown on the surveys (as the same may be amended) referenced above in the Recitals.

R. **"Special Assessment"** or **"Lot Assessment"** means those Special Assessments or Lot Assessments referred to in Article V hereof.

S. **"Setback"** means the minimum distance between the property line and the structures on a lot as required and defined in Article III, Section 3, Paragraph R, hereof.

T. **"Subdivision"** means Santa Fe Summit Phases I, II, IV, V and VI, and Tesuque Creek, all as shown on the surveys (as the same may be amended) referenced above in the Recitals.

U. **"Utility System"** or **"Utilities"** means all equipment, machinery, accessory parts and components, including but not limited to all pipes, booster pumps, buildings, sewers, mains, collectors, lift stations, conduits, lines and appurtenant access ways and facilities, used in connection with sewage disposal, water supply, gas, electricity, telephone, cable television and all other related services.

V. **"Yard"** means any and all portions of any lot lying outside the exterior walls of any House constructed on such lot and shall include all landscaping, improvements and decorative and functional appurtenances thereon.

## ARTICLE II
## Prohibition Against Division, Lot Split or Subdivision

Section 1. No Lot Divisions. No lot within the Property shall be further split, divided, subdivided or separated into smaller lots by any Owner; provided, however, this shall not prohibit corrective deeds or similar corrective instruments having the effect of moving lot lines between adjoining lots for the purpose of correcting errors or trading areas of land or similar purposes. The prohibition contained in this Section 1 shall not prohibit the combination by an Owner of two lots into a single lot. Notwithstanding any provision in this Article II, Declarant shall have the right to divide, subdivide,

modify or adjust plats of lots owned by Declarant within the Property, provided the total number of lots approved for the Subdivision is not increased.

## ARTICLE III
## Use of Property

Section 1. Permitted Uses and Structures. The following uses and structures shall be the only permitted uses and structures within the Property on the following conditions:

A. **Single Family Residential Use, Leasing**. All lots may only be used for single family residential use and related, common uses, and no other use unless expressly permitted under this Consolidated Declaration. Nothing herein shall be deemed to prevent any owner from leasing his property, except that no residence or other structure shall be used for transient occupancy and no lease or sublease shall be for a term of less than thirty consecutive days.

B. **Home Office Use**. A Member may use a portion of his House for a home office or studio, provided that such use does not cause there, at any time, to be parked upon the lot more than one (1) vehicle, which does not belong to the Member, his family or tenants, and provided that such office or studio use remains secondary to the single family residential use of the lot.

C. **Residential Structures**. Unless otherwise permitted in this Consolidated Declaration, no structure shall be placed, built, constructed, or maintained upon any lot except a single family residence, one guest house, garage for at least two automobiles (attached or detached), except the single car garages for lots 9 and 10 within Tesuque Creek, and such other incidental structures which are customarily used in connection with single family residential use, provided that such other incidental structures are not expressly prohibited by this Consolidated Declaration and are approved by the Design Review Committee described in Article IV hereof. All structures must be built and constructed in accordance with the provisions of this Consolidated Declaration, including but not limited to obtaining all required approvals from the Design Review Committee.

D. **Declarant's Use and Structures**. Notwithstanding the provisions of subparagraph C of this Section 1 of Article III or any other provision of this Consolidated Declaration to the contrary, the Declarant, its agents and employees, shall be permitted to use any lot owned by Declarant or leased to Declarant for constructing or maintaining model homes, or other permanent or temporary structures as the Declarant deems required, convenient, or incidental to the completion, improvement, management, sale or developing of lots, Common Areas within the Property or other property owned by the Declarant in the vicinity of, but not necessarily adjoining, the Property. Any permitted temporary structures need not comply with the provisions of the Consolidated Declaration relating to architectural design. Declarant's placement of any structure on the Property is not subject to the approval of the Design Review Committee. Declarant reserves the right to relocate any temporary structures from time to time within the Property for such uses as are permitted by this subparagraph D. Declarant reserves the right to maintain on the Property advertising signs which may be placed on Common Areas and lots owned by Declarant, all at the sole discretion of Declarant.

E. **Solar Panels and Devices**. Solar collection panels or devices shall be allowed only with the express written approval of the Design Review Committee. The Owner shall designate, in detail, the location, size, number and orientation of any solar collector panels or devices proposed for

CONSOLIDATED DECLARATION OF RESTRICTIVE COVENANTS SANTA FE SUMMIT 2009          Page 5

review and approval or denial by the Design Review Committee, which may limit or fix the location, size, number and orientation of any solar collector panels or devices proposed, or may deny the use of such panels or devices altogether.

F. **Tennis Courts and Swimming Pools**. Tennis courts are not permitted in Tesuque Creek. Tennis courts are only permitted in Phases I, II, IV, V and VI, with the express written approval of the Design Review Committee, which may, in its absolute discretion, prohibit tennis courts. The approval of any tennis court by the Design Review Committee shall not require or mandate the approval of any other tennis court, it being the intent of these Covenants to allow the Design Review Committee to consider such proposals on a case-by-case basis. If approved by the Design Review Committee, in any particular case, such tennis court shall be fenced and sited for minimal visibility from the Street or from all other lots within the Property. No tennis court lighting will be allowed. Swimming pools are allowed and shall be visually connected to the main House through walls or courtyards, and screened or separated from direct view of the Street or of all other lots within the Property.

G. **Storage Tanks**. All fuel tanks, water tanks, or similar storage facilities shall either be constructed to be completely shielded from view from any other lot in the Property by walls, vegetation or structures or shall be placed, installed and maintained underground.

H. **Maintenance**. The portions of the House visible from other lots and the Common Areas and all Yards and entrances must be kept in an orderly condition so as not to detract from the neat appearance of the Property. The Board of Directors, in its absolute discretion, may determine whether the visible portions of the Houses and Yards are orderly. The Association may have any objectionable items removed from any Yard so as to restore its orderly appearance, without liability therefor, and charge the Member for any costs incurred in the process, provided however, the Board of Directors shall first give the Owner written notice fifteen (15) days in advance specifying the action needed to comply with this paragraph.

Section 2. Prohibited Uses and Structures. The following uses and structures shall be prohibited on the Property:

A. **Use**. No waste shall be committed to any portion of the Property or to the Common Areas. Waste is defined as an abuse or destructive use tending to cause or causing substantial injury to the Property or to the Common Areas.

B. **No Trailers, Trucks or Boats**. The prohibition contained in this subparagraph B, Section 2, Article III, shall not prohibit the use of trucks and heavy equipment necessary for the construction of homes on a lot. The parking, storing or servicing of commercial and recreational vehicles, including but not limited to, campers, trailers, motor homes, motor bikes, motorcycles, mopeds, go-carts, boats, trucks with a carrying capacity of over three-quarter ton, snowmobiles, disabled vehicles, heavy equipment, or large unsightly equipment outside of storage rooms and garages shall be prohibited. Garages and storage rooms shall be kept closed at all times when not in use for entering and exiting. Recreational vehicles may be brought to a lot only for so long as is reasonably required for packing and unpacking provisions for such vehicle. The use of

CONSOLIDATED DECLARATION OF RESTRICTIVE COVENANTS SANTA FE SUMMIT 2007          Page 6

Case 12-01279-j   Doc 2   Filed 09/10/12   Entered 09/10/12 16:28:23 Page 6 of 32
Case 16-01018-sh   Doc 1   Filed 03/15/16   Entered 03/15/16 17:14:41 Page 13 of 54

motorcycles, motorbikes, mini-bikes or all terrain vehicles in or on the Property is prohibited, except for the purposes of entering and leaving the Property through and on Roads.

C. **Animals and Pets**. No animals, reptiles, horses, bison, buffalo, llamas, rabbits, livestock, fowl or poultry of any kind shall be raised, bred or kept on any lot or in the Common Area and facilities, except that dogs, cats, or other household pets may be kept on a lot in such numbers as do not constitute a nuisance. All pets must be held or kept leashed at all times when they are in the Common Area, or on Roads, and pet owners shall immediately collect and properly dispose of the wastes and litter of their pets. The Board of Directors shall have the right to limit those areas of the Common Area where pets may be walked and to make and publish reasonable rules and regulations restricting the number and type of pets that may be kept on any lot or Common Areas. No horses, mules, burros or other animals shall be ridden on any roads or trails within the Property, except such trails as are designated by the Board of Directors for equestrian use. All dog runs, kennels and fenced in areas for the confinement of permitted household pets shall be maintained in a location not visible from any other lot or Common Areas. The Board may, after three (3) days' notice and giving the owner the opportunity to correct any violation of this Paragraph C, require the removal of pets.

D. **Garbage or Trash Containers**. No garbage, trash containers, or recycle containers shall be visible from the Roads, Common Areas or adjoining lots.

E. **Garbage, Junk and Refuse**. No refuse, rubbish or trash shall be dumped on any lot, nor shall the same be allowed to accumulate on any lot. No junk cars, scrap materials or non-operable vehicles of any kind shall be stored or kept on any portion of the Property.

F. **Temporary Structures**. No structure of a temporary character, including but not limited to, trailers, camping trailers, tents, shacks, barns, sheds or other such outbuildings shall be permitted on any lot at any time, other than:

   1. Temporary structures installed by Declarant; and

   2. Temporary structures during the period of actual construction on a lot; however, such period shall not exceed eighteen (18) months. Such structures shall be reasonably neat in appearance, and shall comply with the construction regulations promulgated by the Design Review Committee.

G. **No Trailers or Outbuildings**. No mobile homes, shacks, sheds, barns or other permanent outbuildings shall be kept, placed or built upon any lot or Common Area within the Property, unless the Design Review Committee shall approve of the same in advance in writing. No swing sets and large-scale recreational vehicles are allowed on any lots that are visible from any other lot or from any Street within the Property.

H. **No Signs**. Except as may be required by legal proceedings, no sign, advertisement or notice of any type or nature whatsoever may be erected or displayed upon any lot, House, Yard, window, or Common Area, unless express prior written approval of the size, shape, content and location has been obtained from the Board of Directors, which approval may be withheld in its absolute discretion. Notwithstanding the foregoing, the Declarant shall be permitted to post and display advertising signs on the Property, and the Board of Directors may erect reasonable and appropriate signs on any portion of the Common Areas.

CONSOLIDATED DECLARATION OF RESTRICTIVE COVENANTS SANTA FE SUMMIT 2009          Page 7

I. **Shading Devices**. No brightly colored window shading devices shall be permitted. No wall-mounted or retractable, recessed soffit mounted shading devices will be permitted without approval by the Design Review Committee.

J. **No Antennae**. There shall be no antenna or satellite antenna or dish or other tower of any sort either installed or maintained, which is visible from any other lot, except as expressly permitted by the Design Review Committee.

K. **No Flag Poles**. There shall be no flag poles or windsocks of any sort either installed or maintained, which is visible from any other lot.

L. **No Athletic Goal Posts**. There shall be no athletic goal posts or basketball hoops of any sort either installed or maintained, which is visible from any other lot.

M. **No Clothes Lines**. There shall be no clothes lines or laundry lines of any sort either installed or maintained, which is visible from any other lot.

N. **No Air Conditioning Units**. There shall be no air conditioning units of any sort either installed or maintained, which are visible from any other lot, except as expressly permitted by the Design Review Committee.

O. **No Mailboxes or Newspaper Tubes**. Mail services will not be provided to individual lots. Mail delivery shall be to a central area located at the entrance off Hyde Park Road. No individual mail boxes or newspaper tubes will be permitted on lots.

P. **Address Signage**. Any provision of this Consolidated Declaration to the contrary notwithstanding, lighted address identification signs for each House shall be permitted and must conform with the design approved by the Design Review Committee. Installation of such signage shall be the responsibility of the Member. No additional signage detached from the House will be permitted.

Q. **Soliciting**. No soliciting will be allowed at any time within the Property.

R. **Nuisances**. No noxious or offensive activity shall be conducted on any lot or in the Common Areas, nor shall anything be done therein, either willfully or negligently, which may be or become an annoyance or nuisance to any Owner or occupant. Without limitation to these, the following items shall be considered noxious, offensive, annoying or dangerous: offensive or foul odors, loud or annoying sounds, discharge of firearms, bright outdoor lights directed toward neighboring lots, fireworks and mining or drilling operations, and excessive barking from dogs.

S. **Storage of Building Materials**. The outdoor storage of building materials other than during construction shall not be permitted, except that this prohibition shall not apply to the Declarant.

T. **No Commercial Activity**. Except as provided above in subparagraphs B and D, Section 1, Article III, no industry, business, trade, occupation or profession of any kind, commercial,

CONSOLIDATED DECLARATION OF RESTRICTIVE COVENANTS SANTA FE SUMMIT 2007          Page 8

Case 12-01279-j   Doc 2   Filed 09/10/12   Entered 09/10/12 16:28:23 Page 8 of 32
Case 16-01018-sh   Doc 1   Filed 03/15/16   Entered 03/15/16 17:14:41 Page 15 of 54

religious, educational or otherwise, designed for profit, altruism, exploitation or otherwise shall be conducted on any lot.

U. **No Obstructions at Intersections**. Nothing shall be erected, constructed, planted or otherwise placed on a lot in such a position (subsequent to the initial construction of improvements on the Property by Declarant) so as to create a hazard upon or block the vision of motorists at intersections.

V. **Removal of Protected Plants**. As used in this paragraph "Protected Trees" are those Ponderosa Pine and piñon pine trees of six-inch (6") caliper or greater. All construction of any type and all excavation shall be conducted so as to avoid damage to these Protected Trees to the extent reasonably possible. With the exception of diseased or dead Protected Trees, the Design Review Committee must approve any plans for removing or transplanting these Protected Trees, and it is recommended that professionals be consulted prior to removing or transplanting any plant material. Owners are referred to Article IV, Section 2, requiring approval before any construction or excavation, all as stated therein.

Section 3. Architectural and Related Standards. The following architectural standards found in this Article III, Section 3 shall apply to the design and construction, improvements, alterations, modifications, and changes to structures on all lots within the Property and all excavation thereon.

A. **Natural Landscape**. It is the purpose and intent of this Consolidated Declaration that an environment in harmony with the natural landscape be maintained. Some properties have dense vegetation on and around them; others have less. As part of the initiation of preliminary design studies through construction, Owners are urged to consider impacts of construction on all adjacent or nearby properties.

B. **Pueblo or Territorial Architecture**. These architectural standards are intended to permit a variety of architectural solutions within the design range of Pueblo or Territorial styles, including contemporary and modern interpretations of these styles. The exterior of all buildings, including Houses, shall be of only subdued colors all of which must be approved by the Design Review Committee and all surfaces shall be non- reflective, except for glass surfaces and skylights which shall be non- mirrored.

C. **No Reflective Finishes**. No reflective finishes (other than glass or skylights, which may not be mirrored) shall be used on exterior surfaces or roofs (other than surfaces of hardware fixtures), including without limitation the exterior surfaces of any of the following: all projections above roofs, retaining walls, doors, trim, fences, pipes, and other equipment.

D. **Height of Structure.**

    i.   Escarpment Overlay District Ordinance. The height of all Houses in Phases I, II, IV, V, and VI are subject to the requirements and limitations of the City of Santa Fe's Escarpment Overlay District Ordinance found in Chapter XIV of the Santa Fe City Code 1997, and notice is given that the Subdivision is subject to certain portions of the regulations under the City of Santa Fe's Escarpment Overlay Ordinance found in Chapter XIV of Santa Fe City Code 1987.

CONSOLIDATED DECLARATION OF RESTRICTIVE COVENANTS SANTA FE SUMMIT 2009      Page 9

Case 12-01279-j   Doc 2   Filed 09/10/12   Entered 09/10/12 16:28:23 Page 9 of 32
Case 16-01018-sh   Doc 1   Filed 03/15/16   Entered 03/15/16 17:14:41 Page 16 of 54

EC CLERK RECORDED 07/09/2003

ii.   Phases I and II. In addition to the requirements and limitations of the City of Santa Fe's Escarpment Overlay District Ordinance, in Phases I and II, the maximum height of any House at any point shall not exceed fourteen feet (14') above the highest natural grade adjacent to the House, which includes parapets and clerestories, and shall not exceed twenty feet (20') above the natural grade adjacent to the House at the point on the House being measured, which includes parapets and clerestories. One chimney on each section of roof may be constructed not to exceed three feet above the top of the adjacent roof. No more than fifty percent (50%) of any facade shall exceed two stories in height in a single plane and no facade shall be more than fifty feet (50') in length in a single plane. All facades with offsets of less than two feet (2') are hereby defined as being in a single plane.

iii.  Phases IV, V, and VI. For lots 28 through 35 in Phase IV, the highest point of any structure shall not exceed a maximum height of 14 feet above each and every point of measurement along the structure perimeter. This measurement shall be from the undisturbed natural grade of the land at the perimeter, or from the finished grade at the perimeter, whichever is more restrictive in height.  The highest point on the structure includes the top of parapets and clerestories, except that chimneys may exceed the maximum height by not more than three feet above the immediately adjacent roof.

      For all other lots in Phases IV, V and VI, The maximum height of any structure in the foothills subdistrict shall be determined by the more restrictive of the following calculations:

      a.    The highest point on the structure shall not exceed a maximum height of 14 feet above the highest natural grade at the perimeter of the structure.

      b.    The highest point on the structure shall not exceed a maximum height of 20 feet above each and every point of measurement along the structure perimeter. This measurement shall be from the undisturbed natural grade of the land at the perimeter, or from the finished grade at the perimeter, whichever is more restrictive in height.

      c.    The highest point on the structure includes the tops of parapets and clerestories, except that chimneys may exceed the maximum height by not more than three feet above the immediately adjacent roof. Adding fill dirt to the natural grade in order to increase the height is prohibited.

iv.   Tesuque Creek. For Lots 1 through 8 in Tesuque Creek, the building heights for elevations facing Hyde Park Road shall be limited to 14 feet. In all lots in Tesuque Creek, the maximum height of any structure shall be determined by the more restrictive of the following calculations:

      a.    The highest point on the structure shall not exceed a maximum height of 14 feet above the highest natural grade at the perimeter of the structure.

Case 12-01279-j    Doc 2    Filed 09/10/12    Entered 09/10/12 16:28:23 Page 10 of 32
Case 16-01018-sh    Doc 1    Filed 03/15/16    Entered 03/15/16 17:14:41 Page 17 of 54

b.  The highest point on the structure shall not exceed a maximum height of 24 feet above each and every point of measurement along the structure perimeter. This measurement shall be from the undisturbed natural grade of the land at the perimeter, or from the finished grade at the perimeter, whichever is more restrictive in height.

c.  The highest point on the structure includes the tops of parapets and clerestories, except that chimneys may exceed the maximum height by not more than three feet above the immediately adjacent roof. Adding fill dirt to the natural grade in order to increase the height is prohibited.

### E. Size Restrictions.

i.  Phases I, II and IV. In Phases I, II and IV, Houses shall have a minimum of two thousand two hundred (2,200) square feet of Living Space, if a single story, and in the case of a two-story House, a minimum square footage of eighteen hundred (1,800) square feet on the ground floor and six hundred (600) square feet on the second floor.

ii.  Phases V and VI. In Phases V and VI of the Subdivision, Houses shall have a minimum of one thousand five hundred (1,500) square feet of Living Space.

iii.  Tesuque Creek. In Tesuque Creek, Houses shall have a minimum of one thousand eight hundred (1,800) square feet of Living Space, except for Lots 9 and 10, on which Houses shall have a minimum of 1,100 square feet of Living Space.

iv.  Lot Coverage. Houses constructed on any lot in Phases I and II shall not exceed a maximum lot coverage of forty percent (40%) of any lot.

F.  **Roofs**. All roofs shall be of a material, color, and texture approved by the Design Review Committee. The color of roofs must conform to the color standards set forth in subparagraph G, Section 3, Article III. Colors such as black, white, bright colors or reflective roof surfaces which cause glare are prohibited. In Phases I and II, no pitched roofs shall be permitted. On all other Lots, pitched roofs are only allowed with express written approval of the Design Review Committee, which may in its absolute discretion deny such roofs.

G.  **Color**. The color of external surfaces must be approved by the Design Review Committee, which has absolute discretion to approve colors of external surfaces. Colors must be of a subdued nature and shall tend to have the effect of lessening the visual impact of the structures.

H.  **Material and Exterior Surfaces**. Exterior surfaces shall be generally stucco, traditional adobe, and stone. Large expanses of painted vertical or horizontal planes and surfaces, and large expanses of vertical or horizontal wood are prohibited.

I.  **Building Projections**. All projections from a House or other structure including, but not limited to, chimney flues, vents, gutters, down spouts, canales, utility boxes, porches, portals, and railings shall be of an approved color.

J.  **Walls or Fences**. Walls may be used to enclose or surround an Enclosed Area and as screening for cars and service areas of the House. Additionally, walls may be constructed within the front Yard setbacks along or parallel to the front Yard lot lines adjacent to any road. All other walls

CONSOLIDATED DECLARATION OF RESTRICTIVE COVENANTS SANTA FE SUMMIT 2009          Page 11

Case 12-01279-j   Doc 2   Filed 09/10/12   Entered 09/10/12 16:28:23 Page 11 of 32
Case 16-01018-sh   Doc 1   Filed 03/15/16   Entered 03/15/16 17:14:41 Page 18 of 54

NM CLERK RECORDED 07/09/2009

shall be prohibited unless the Design Review Committee shall approve of such other walls, including lot perimeter walls. Lot perimeter walls are not permitted on any Lot in Phases I and II. The type of materials to be used in the construction of walls must be approved by the Design Review Committee. Fencing shall not be allowed, except cedar post, coyote fences, the plans for which must be approved by the Design Review Committee before construction and which may, in the absolute discretion of the Design Review Committee, be approved or denied.

Walls and fences shall not exceed four feet six inches (4' 6") in height, except with special written permission of the Design Review Committee, walls may be up to six feet (6') in height measured from natural grade.

K. **Retaining Walls**. Retaining walls that are not part of the House structure shall not exceed five feet (5'), except by approval of the Design Review Committee and shall be finished (material, texture, color, etc.) to match the House or the natural landscape. All retaining walls shall be designed by a licensed architect or engineer.

Detached retaining walls which exceed forty feet (40') in length in any direction must be approved by the Design Review Committee. Total length of all retaining walls shall not exceed one hundred forty feet (140') unless specially reviewed and approved by the Design Review Committee. Such a request can be based only upon unusual natural site conditions or special design considerations.

L. **Foundations**. All exterior wall materials must be continued down to finish grade thereby eliminating unfinished foundation walls, except in the case of a rock foundation, where the wall material stops at the rock facing.

M. **Guest Houses**. A guest house is permitted with approval from the Design Review Committee. Unless otherwise approved by the Design Review Committee, such structures shall be designed as a single visual element with the primary House, and shall be visually connected by walls, portals, or other major structures. The guest house must comply with the applicable zoning regulations. No guest house or guest suite may be leased or rented separate and apart from the main House on a lot.

N. **Exterior Changes**. Any changes to the approved plans before, during, or after the construction of an improvement must be submitted to the Design Review Committee for approval.

O. **Parking Spaces**. Except for construction vehicles during periods of construction, or for occasional gatherings no on-street parking will be permitted within rights-of-way or roadway easements. No Owner shall park his vehicles on the roads within the rights-of-way or roadway easements. Except for Lots 9 and 10 in Tesuque Creek, each garage shall contain parking space for at least two automobiles and there shall be additional space outside the garage for two (2) vehicles.

P. **Screening**. Visual barriers are required to screen all garbage receptacles, fuel tanks, gas and electric meters, air conditioning equipment, and materials, supplies, equipment, dog runs, and other outdoor maintenance facilities to conceal them from view from Roads and adjacent lots

Case 12-01279-j   Doc 2   Filed 09/10/12   Entered 09/10/12 16:28:23 Page 12 of 32
Case 16-01018-sh   Doc 1   Filed 03/15/16   Entered 03/15/16 17:14:41 Page 19 of 54

and eliminate or minimize the noise audible from adjacent lots. Notwithstanding any provision of this Consolidated Declaration to the contrary, any such visual barrier shall be at least six feet (6') high and shall consist of either fencing or a wall or landscaping and planting, unless otherwise approved by the Design Review Committee.

Q. **Site Drainage and Grading**. Site drainage and grading shall be done with the minimum disruption to the natural condition of the lot. Storm water retention ponds constructed by Declarant shall be maintained in the locations as shown in the development plan approved by the Extraterritorial Zoning Commission for the Subdivision, and the Association shall have the right and the duty to maintain said retention ponds.

R. **Setbacks**. Unless otherwise approved by the Design Review Committee as provided in Article IV, Section 3, Paragraph B of this Consolidated Declaration, the following setbacks shall apply for all structures, except for walls approved by the Design Review Committee, on lots within the Subdivision.

    i.    **Phases I and II**. For Lots within Phases I and II, there shall be a minimum forty foot (40') front yard setback from all Streets, which area shall remain undisturbed, except as expressly provided in this Consolidated Declaration to the contrary. Where lots have a frontage on two (2) Streets, the required front Yard shall be required on only one (1) Street to be chosen by the Owner, except that in no case shall the setback from North Summit Drive be less than forty feet (40'). There shall be a side Yard setback of not less than twenty feet (20') on each side of a building.

          There shall be a rear Yard setback of not less than twenty-five feet (25') on lots with frontage on a single street. On lots with frontage on two streets, there shall be a twenty foot (20') setback from lot lines not adjoining the streets.

          There shall not be less than ten feet (10') between a primary House and any other House or structure on a lot. Accessory buildings shall not be constructed in either front Yard of a corner lot unless approval is given by the Design Review Committee.

    ii.    **Phases IV, V, and VI**. For lots within Phases IV, V, and VI, there shall be minimum twenty foot (20') front Yard setback from all streets, which area shall remain undisturbed, except as expressly provided in this Consolidated Declaration to the contrary. There shall be a side Yard setback of not less than twenty feet (20') on each side of a building. There shall be a rear Yard setback of not less than twenty-five feet (25') on lots with frontage on a single Street. On lots with frontage on two Streets, there shall be a twenty foot (20') setback from lot lines not adjoining the Streets.

    iii.    **Specific Regulations for Lots 49 through 55, 58, 59 and 61 through 79A-2**. For Lots 49 through 55, 58, 59 and 61 through 79A-2 there shall be minimum twenty foot (20') front Yard setback from all Streets, which area shall remain undisturbed, except as expressly provided in this Consolidated Declaration to the contrary. There shall be a side Yard setback of not less than twelve and one-half feet (12.5') on each side of a building. There shall be a rear Yard setback of not less than twelve and one-half feet (12.5') on lots with frontage on a single Street. It is noted that the commercial property adjacent to

Case 12-01279-j   Doc 2   Filed 09/10/12   Entered 09/10/12 16:28:23 Page 13 of 32
Case 16-01018-sh   Doc 1   Filed 03/15/16   Entered 03/15/16 17:14:41 Page 20 of 54

NM CLERK RECORDED 07/09/2009

Lots 66, 69, 70, and 71 is encumbered with a fifty foot (50') prohibition against construction, as depicted on Exhibit A.

iv. **Specific Regulations for Lots 56, 57, 60 and 80 through 84**. For Lots 56, 57, 60 and 80 through 84, there shall be minimum twenty foot (20') front Yard setback from all Streets, which area shall remain undisturbed, except as expressly provided in this Consolidated Declaration to the contrary. There shall be a side Yard setback of not less than fifteen feet (15') on each side of a building. There shall be a rear Yard setback of not less than ten feet (10') on lots with frontage on a single Street. In all cases, there shall not be less than ten feet (10') between a primary House and any other House or structure on a lot. Accessory buildings shall not be constructed in either front Yard of a corner Lot unless approval is given by the Design Review Committee. Where lots have a frontage on two (2) Streets, the required front Yard shall be required on only one (1) Street to be chosen by the Owner.

v. **Tesuque Creek**. Unless otherwise approved by the Declarant, there shall be:

    a. a side Yard setback of not less than five feet (5') on each side of a building;

    b. a rear Yard setback of not less than ten feet (10') on lots with frontage on a single Street; and

    c. a front Yard setback of not less than ten feet (10').

In all cases, there shall not be less than ten feet (10') between a primary House and any other House or structure on a lot. Accessory buildings shall not be constructed in either front Yard of a corner Lot unless approval is given by the Design Review Committee.

vi. **Variances to SetBack Restrictions.** The Design Review Committee may vary the foregoing setback restrictions in this paragraph R for good cause shown based upon topographical consideration. Any variance must be specifically requested by an Owner in writing and approved in writing by the Design Review Committee.

S. **Access Drives**. Wherever feasible, the Design Review Committee will encourage shared driveways between two (2) lots. Minimum width of driveway shall be twelve feet (12'). Maximum width, unless approved by the Design Review Committee, shall be fourteen feet (14'), except where necessary to provide for parking. Approval of the final location and design of the driveway shall be obtained during the submittal of the preliminary design to the Design Review Committee.

T. **Building Envelope**. All structures and all construction shall occur substantially within the "building envelopes" prepared by the Declarant for each lot, the approximate locations of which "building envelopes" are shown on the Final Development Plan for the Property. The "building envelope" roughly depicts the disturbable area on the lot. The "building envelope" has boundaries which have been approximated and shall serve as a guideline for Owners in preparing plans and specifications and for the Design Review Committee in approving the same.

CONSOLIDATED DECLARATION OF RESTRICTIVE COVENANTS SANTA FE SUMMIT 2007      Page 14

Case 12-01279-j   Doc 2   Filed 09/10/12   Entered 09/10/12 16:28:23 Page 14 of 32
Case 16-01018-sh   Doc 1   Filed 03/15/16   Entered 03/15/16 17:14:41 Page 21 of 54

The "building envelope" may be altered with approval of the Design Review Committee so long as the entire area of the "building envelope" is not substantially enlarged by such alteration. The area within the lots outside the building envelopes shall be undisturbed, privately owned open space.

U. **On-Site Detention Ponds**. Lots 30 through 37, inclusive, are required to build on-site detention ponds to accommodate storm water runoff created by the development of the lot as provided on Sheet 9B of the engineering plans approved as part of the Subdivision.

V. **Lighting**. Exterior lighting shall be designed and installed in such a manner that it does not shine directly onto adjoining lots so as to interfere with the adjoining Owner's use and enjoyment of his lot.

W. **Water Restrictions. Tesuque Creek**. In Tesuque Creek, the following water restrictions apply:

    1.   Domestic water use is restricted to .25 acre-feet per year per lot / tract.

    2.   Water conserving appliances shall be installed and used at the time of construction or replacement of appliances.

    3.   Toilets shall be of a type designed for use of no more than 1.6 gallons per flush

    4.   Bathtubs and lavatory fixtures shall be fitted with faucets with a maximum capacity of 2.5 gallons per minute. Shower heads shall have a capacity of no more than 2.5 gallons per minute.

    5.   Hot water pipes shall be insulated.

    6.   Evaporative coolers must circulate bleed-off water.

    7.   Low water use landscaping techniques applying the principles of xeriscaping shall be utilized. Drip irrigation and mulching are encouraged whenever possible. Low water use grasses, trees and shrubs may be watered as needed during the first and second years of their growth to become established. Thereafter, such vegetation shall receive only minimal water as needed by each species.

### ARTICLE IV
### Architectural Control
### By Design Review Committee

Section 1. Design Review Committee. The Board of Directors shall establish the Design Review Committee for the Property which shall consist of at least five (5) persons who may or may not be members of the Board of Directors, two of whom must be residents of Hyde Park Estates subdivision. The Hyde Park Estates members will participate and vote only on issues involving lots in Phases IV, V and VI, and Tesuque Creek. Until such time as Class B voting has expired, Declarant shall appoint and remove the members of the Design Review Committee, except for the two members of the Design Review Committee who are residents of Hyde Park Estates Subdivision, who shall be selected from the residents of Hyde Park Estates.

CONSOLIDATED DECLARATION OF RESTRICTIVE COVENANTS SANTA FE SUMMIT 2009      Page 15

Case 12-01279-j   Doc 2   Filed 09/10/12   Entered 09/10/12 16:28:23 Page 15 of 32
Case 16-01018-sh   Doc 1   Filed 03/15/16   Entered 03/15/16 17:14:41 Page 22 of 54

Each Design Review Committee member shall be appointed for a one (1) year term commencing with the fiscal year of the Association and may be removed with or without cause by the Board of Directors or the Declarant (whoever shall then have the authority to appoint members of the Design Review Committee) at any time by written notice, with successors appointed to fill such vacancy for the remainder of the term of the former member. The Chairman of the Design Review Committee shall be one of the non-Hyde Park members elected by majority vote of the Board of Directors of the Association. The members of the Design Review Committee shall not be liable to any person for any damage to persons or property or other damages for any reason resulting from or relating to the exercise of the powers or performance of obligations required or authorized by the Consolidated Declaration, and by acceptance of a deed for any lot, every Owner on his own behalf and on behalf of his heirs, successors, assigns and agents, releases each such member from said liability; provided, however, that such release shall not apply to any such injury or damage resulting from willful misconduct of a member of the Design Review Committee. Three (3) members shall constitute a quorum for the transaction of business involving Lots in Phases IV, V, VI, and Tesuque Creek and two (2) members shall constitute a quorum for the transaction of business involving Lots in Phases I and II. The affirmative vote of the majority of those present in person or by proxy shall constitute the action of the Design Review Committee on any matter before it. The Design Review Committee is authorized to retain, and pay for, the services of consulting architects, landscape architects, urban designers, engineers, inspectors, contractors and/or attorneys in order to advise and assist the Design Review Committee in performing its functions as set forth herein. Any services paid for shall be reimbursed by the Owner on whose behalf the review is completed by the Design Review Committee. Additionally, members of the Design Review Committee may be compensated by the Association for their time; provided, however, members of the Design Review Committee who are Owners, employees of or shareholders in the Declarant shall not be compensated for their time.

Section 2. Construction Subject to Architectural Control. No construction, modification, alteration, excavation or other improvement of any nature whatsoever on any lot, except for interior alterations not affecting the external structure or appearance of any structure within the Property, shall be undertaken on any lot unless and until a professionally prepared plan of such construction or alteration shall have been approved in writing by the Design Review Committee and the Design Review Committee has visited the lot to verify that the siting of the structure will comply with this Consolidated Declaration. Modifications and alterations subject to Design Review Committee approval specifically include, but are not limited to, painting or other alteration of a House (including doors, windows and roof), installation of solar panels or other devices, construction of fountains, swimming pools, whirlpools, or other pools, construction of privacy walls or other walls, addition of shutters, gates, shelves, statues, lighting or other outdoor ornamentation, installation of patterned or brightly colored internal window treatment, any alteration of the landscaping or topography of the lot, including without limitation any cutting or removal of healthy trees, planting or removal of plants, or similar features of the Property and all other modifications, alterations or improvements visible from Common Areas or other lots. This Article IV shall not apply to any portion of the Property while it is being utilized by the provider of a utility or by Declarant. Notice is hereby given that all plans and specifications are subject to the review of the City of Santa Fe Technical Review Department for compliance with certain provisions of the Escarpment Overlay Ordinance found in Chapter XIV of Santa Fe City Code 1987 of the City of Santa Fe.

## Section 3. Architectural Design Review Procedures

A. **Submission of Plans**. Plans and specifications shall be submitted to the Design Review Committee in accordance with the following submittal and review procedures.

B. **Review of Plans**. The Design Review Committee shall conduct reviews of plans at such times as it deems appropriate. The Design Review Committee shall respond to a Member in writing after the review of the submittals no later than thirty (30) days after all submittals are completed, provided that the plans are in accordance with the requirements of the rules and regulations promulgated and published by the Design Review Committee for preliminary and final approval. An approval by the Design Review Committee shall be in writing and shall specify what, if any, aspects of the submittal are approved or disapproved and, if disapproved, the reasons for the same. The Design Review Committee may approve or disapprove of submittals in whole or in part and may authorize commencement of construction on such aspects of the proposed plan and specifications as are approved.

C. **Rules and Regulations**. The Design Review Committee shall adopt, publish and make available to all Members upon request, rules and regulations governing construction on all lots, including all required submittals, the review and approval process, inspection of work in progress and after completion, and such other matters governing the affairs and duties of the Design Review Committee. Such rules and regulations may be amended from time to time as the Design Review Committee shall deem appropriate, but such amendments shall not affect completed submittals already before the Design Review Committee. The Association shall enforce such rules and regulations.

D. **Right of Waiver**. The Design Review Committee reserves the right to waive or vary any of the procedures, standards, limitations or restrictions set forth in this Consolidated Declaration in its discretion, for good cause shown.

E. **Commencement of Construction**. Upon receipt of approval from the Design Review Committee, the Owner shall, as soon as practical, satisfy all conditions thereof, if any, and diligently proceed with the commencement and completion of all construction, reconstruction, refinishing, alterations, and excavations pursuant to the approved plans within one (1) year from the date of such approval. If the Owner shall fail to comply with this paragraph, any approval given shall be deemed revoked unless, upon the written request of the Owner made to the Design Review Committee prior to the expiration of said one (1) year period and upon a finding by the Design Review Committee that there has been no change in circumstances warranting denial of the plans, the time for such commencement is extended in writing by the Design Review Committee. The Owner shall in any event complete the construction, reconstruction, refinishing, or alteration of the foundation and all exterior surfaces (including the roof and exterior walls) on his lot within eighteen (18) months after commencing construction thereof. So long as there is continuous construction activity on the home being built, the one year building period may be extended for good cause shown by Owner, or for so long as such completion is rendered impossible or would result in great hardship to the Owner. There shall be a temporary construction fence erected during all phases of construction to enclose the construction area and to protect the natural vegetation adjacent to the building envelope. Such fence shall comply with all applicable rules and regulations of the Design Review Committee.

F. **Escrow of Construction Costs**. Prior to the commencement of construction, the Owner shall place $10,000.00 in cash in escrow with the Association to assure the satisfactory completion of the approved construction, preservation and replacement of the natural landscape, clean up of debris and trash, and the repair of any damage resulting from construction, or repair of streets damaged during construction. The Owner of a lot served by the low pressure sewer system shall place an additional $3,000.00 in cash in escrow with the Association to assure the proper connection to the sewer system. The Association shall deposit all cash held in escrow in an interest bearing account. Upon completion of construction, each Owner and builder shall clean his construction site and repair all property which was damaged, including but not limited to restoring grades, planting trees as approved or required by the Design Review Committee, and repair of streets, driveways, drains, culverts, ditches, signs, lighting and walls. In the event any of the foregoing are not satisfactorily completed or maintained, the Board of Directors or the Design Review Committee may withdraw any sums from escrow, including interest earned thereon, and expend the same as necessary to effect the proper preservation and replacement of the natural landscape and cleanup of debris and trash removal from the lot and to cover any administrative or covenant enforcement costs it may incur in this regard. The remaining amount in escrow after completion of the construction to the satisfaction of the Design Review Committee shall be paid to the Owner after an approved final inspection is made by the Design Review Committee, which inspection shall occur no later than 60 days after Owner's request. Any of the requirements of this subparagraph may be waived by the Design Review Committee for modifications or alternatives to construction that take place after initial construction is completed. The escrow provisions of this Paragraph F shall not apply to the Declarant.

G. **Fee**. The Design Review Committee may establish a fee sufficient to cover the expenses of reviewing and copying plans and related data and to compensate the Design Review Committee, any consulting architects, landscape architects, inspectors, or attorneys retained in accordance with the terms hereof. The Design Review Committee may increase the fee established for such review from time to time. The administration of any such fees shall be managed by the Association.

H. **Non-Waiver**. The approval by the Design Review Committee of any plan, drawings, or specifications for any work done or proposed, or in connection with any other matter requiring the approval of the Design Review Committee under the Design Guidelines or the Consolidated Declaration, shall not be deemed to constitute a waiver of any right to withhold approval as to any similar plan, drawing, specification, or matter whenever subsequently or additionally submitted for approval.

Section 4. Appeals. Any Owner may appeal an adverse decision of the Design Review Committee to the Board of Directors who may reverse or modify the decision of the Design Review Committee by the unanimous vote of all Directors.

Section 5. Approval Not a Guarantee. Any approvals under or any compliance with this Consolidated Declaration is no guarantee that any structure or construction complies with any applicable regulation promulgated by any governmental authority. Compliance with such regulations is each Owner's sole responsibility. No approval of plans and specifications and no publication of architectural standards shall be construed as representing or implying that such plans, specifications, or standards will, if

followed, result in soundly designed improvements. Such approvals and standards shall in no event be construed as representing or guaranteeing that any House or other improvement built in accordance therewith will be built in accordance with applicable deed restrictions, building codes or other governmental requirements, or in good and workmanlike manner. Neither Declarant, the Association, nor the Design Review Committee shall be responsible or liable for any defects in any plans or specifications submitted, revised, or approved pursuant to the terms of this Consolidated Declaration, nor any defects in construction undertaken pursuant to such plans and specifications.

### ARTICLE V
### Owners Association

Section 1. Association Duties and Powers. The Declarant has caused to be formed a non-profit corporation to function as the Association for Phases I, II, IV, V, VI and Tesuque Creek. The duties and powers of the Association shall be those set forth in this Consolidated Declaration, as well as the Association's Bylaws and Articles of Incorporation, as amended from time to time, together with those duties and powers which may be reasonably implied to effect the purposes of the Association. The Board of Directors of the Association is hereby granted the express authority to cause the Association to become a member of another association existing for the same or similar purposes.

A. **Utilities, Drainage Facilities and Roads**. The Association shall maintain all Utility Systems owned by it, all drainage facilities for the drainage of storm waters from Roads and storm water retention ponds described in the approved development plan for the Subdivision. The Association or Declarant shall have the power to grant Utility easements along, over, across, under and through the Common Area as may be reasonably required to provide such Utility service to the Common Area and the lots. The Association shall provide Road maintenance, snow removal, landscape maintenance and management of the Common Areas.

   More specifically, the Board of Directors of the Association shall establish a schedule for the inspection and maintenance of said Utilities, drainage facilities and Roads containing at least the following:

   1. Provisions for the removal of snow from Roads within the Subdivision on an as-needed basis; and

   2. Provisions for the inspection, cleaning and general maintenance of all owned Utilities, improvements, and drainage facilities on at least an annual basis; and

   3. Provisions for the repair of Roads at least once annually and within thirty (30) days of becoming aware of a potentially dangerous condition in a roadway.

B. **Liability Insurance**. The Association shall procure a policy or policies insuring the Board of Directors, the Officers of the Association, the Design Review Committee, the Association, the Members and the Association's employees against any liability to the public or to other Members, incident to the ownership and use of the Common Area and any other property or interest owned by the Association.

C. **Security Services**. The Association may procure security services for the protection of the Property and Common Areas as the Board of Directors shall consider reasonably necessary.

D. **Maintenance**. The Association shall provide all maintenance, replacement, repair and all landscaping of the Common Areas and other property owned by the Association.

E. **General Requirements**. The Association may do any other act or provide any other materials, supplies, labor, services, maintenance, repairs, insurance, taxes or assessments which the Association is required to secure or pay pursuant to the terms of this Consolidated Declaration, the Association's Bylaws or Articles of Incorporation, or by law or which in the discretion of the Board of Directors shall be necessary or proper for its operation or the enforcement of this Consolidated Declaration.

F. **Contract for Maintenance and Solid Waste Removal**. The Association, upon request of an Owner, may, in its discretion, enter into a contract for the routine maintenance of those portions of the Owner's lot not otherwise required to be maintained by the Association on terms and conditions satisfactory to the Board of Directors. All costs of said maintenance shall become a lot Assessment. The Association shall contract for the regular removal of solid waste from the Property.

G. **Contracts**. Subject to the approval of the Class B Member, if any, the Association may employ or contract with one or more third parties for the performance of all or any portion of the Association's management, maintenance and repair activities as the Board of Directors may choose. The Association shall be billed by its independent contractors, and the costs therefor shall be included within the General Assessment or lot Assessment, as the case may be.

H. **Rules and Regulations**. Through the Board of Directors, the Association may, from time to time, adopt rules or amend previously adopted rules and regulations governing the details of the operation, use, maintenance and control of the lots and Common Areas, and any facilities or services made available to the Owners. A copy of all such rules and regulations adopted from time to time as herein provided shall be posted in a conspicuous place on the Property or furnished to each Owner, or kept at the Association offices, if any.

Section 2. Association's Power to Make Assessments or Create a Lien and Personal Obligations for Assessments.

A. The Association through its Board of Directors shall have the power to make the Assessments provided for in this Consolidated Declaration; provided, however, Declarant shall not pay any Assessments on any lots owned by Declarant or by a successor entity which Declarant controls. All Assessments together with interest and costs of collection when delinquent, shall be a charge on the land and shall be a continuing lien upon the lot against which the Assessments are made, and shall also be the personal obligation of the person or entity who was the Owner of such lot at the time when the Assessments were levied. Each Owner of a lot, by acceptance of a deed or other transfer document therefor, whether or not it shall be so expressed in such deed or transfer document, is deemed to covenant and agree to pay the Association the Assessments established or described in this Article V and in the Association's Articles of Incorporation, Bylaws and rules and regulations. No diminution or abatement of any Assessments shall be allowed by reason of any alleged failure of the Association to perform some function required of it, or any alleged

CONSOLIDATED DECLARATION OF RESTRICTIVE COVENANTS SANTA FE SUMMIT 2007                    Page 20

CLERK RECORDED @ 7/83/2883 JC

negligent or wrongful acts of the Association or its directors, officers, agents and employees or the non-use by an Owner of any or all of the Common Areas, the obligation to pay such Assessments being a separate and independent covenant by each Owner.

B. Notwithstanding any provision contained herein to the contrary, the Owners of Lots 9 and 10 in Tesuque Creek shall not pay any General or Special Assessments to the Association so long as such Lots are subject to the City of Santa Fe Housing Opportunity Program. The Lot 9 and 10 Tesuque Creek exemption from the payment of General or Special Assessments may not be modified without the express consent of the City of Santa Fe while such lots are subject to the housing opportunity program. However, the exemption contained in this Section 2.B. shall not operate or be construed as a waiver or exemption from any other requirement of this Consolidated Declaration with respect to Lots 9 and 10. In the event Lot 9 and/or Lot 10 is sold or transferred to any Owner that is not a "HOP property owner," as that term is defined in the City of Santa Fe Housing Opportunity Program, then the exemption contained in this Section 2.B. shall cease to apply to Lot 9 and/or Lot 10, as the case may be. After such transfer, any Owner (who is not a "HOP property owner") shall pay General and Special Assessments in the same manner as the other lot Owners in Tesuque Creek.

Section 3. Annual General Assessment. With the exception of Lots 9 and 10 in Tesuque Creek (as long as the Owner(s) of such lot(s) is a "HOP property owner"), each lot is subject to Annual General Assessments by the Association for the improvement, maintenance and operation of the Property, including the management and administration of the Association and furnishing of services as set forth in this Consolidated Declaration. As further described in this Article V, the Board of Directors by majority vote shall set the annual General Assessments at a level sufficient to meet the Association's obligations. The Board of Directors shall have the right, power and authority, during any fiscal year, to increase the annual General Assessment for the purpose of meeting its expenses and operating costs on a current basis. The Board of Directors shall set the date or dates that Assessments shall become due, and may provide for collection of Assessments annually or in monthly, quarterly or semi-annual installments; provided however, that upon default in the payment of any one or more installments, the entire balance of the annual Assessment may be accelerated at the option of the Board of Directors and be declared due and payable in full.

Section 4. Special Assessment. The Association may levy a Special Assessment at any time by a majority vote of the Board of Directors, for the purpose of defraying, in whole or in part, the cost of any unusual or emergency matters that affect the Association and/or Common Areas, and shall be due and payable at the time and in the manner specified by the Board of Directors. Special Assessments shall be levied equally against all the Lots with the exception of Lots 9 and 10 in Tesuque Creek (as long as the Owner(s) of such lot(s) is a "HOP property owner") and lots owned by Declarant.

Section 5. Lot Assessments. In addition to the Assessments authorized above, the Association may levy in any Assessment year a lot Assessment against a particular lot or lots for the purpose of defraying, in whole or in part, the cost of any construction, reconstruction, repair or replacement of any structure upon the specific lot or lots which structure serves or benefits only that particular lot or lots, or any other maintenance or special services provided to such lot or its Owner, the cost of which is not included in the General Assessment.

Section 6. Commencement of Annual Assessments. The annual General Assessments provided for herein shall commence on the day of conveyance of the first lot within the Property to an Owner who is not Declarant. Each Owner's obligation to pay Association assessments shall commence upon a purchase of a lot. The initial assessment on any lot subject to assessment shall be collected at the time title to such lot is conveyed to the Owner. During the initial year of ownership, each Owner shall be responsible for the *pro rata* share of the General or Special Assessments assessed to that Owner's lot prorated to the day of closing based upon a thirty (30) day month.

Section 7. Effect of Nonpayment of Assessment; Remedies of the Association.

A. Late Fees, Interest. Any Assessments not paid within fifteen (15) days after the due date shall be subject to a late fee as determined from time to time by the Board of Directors, and may, upon resolution of the Board, bear interest at a lawful percentage rate determined by the Board.

B. Lien and Acceleration. All Assessments against any lot pursuant to this Consolidated Declaration, together with such late fee, interest thereon, and cost of collection thereof (including reasonable attorneys' fees, whether suit is filed or not), shall become a lien on such lot upon the filing of a claim of lien in the records of the Santa Fe County Clerk. The Association may bring an action at law against the Owner personally obligated to pay the Assessments and additional costs of collection, foreclose the lien against the lot, or both. Costs and reasonable attorneys' fees incurred in any such action may be awarded to the prevailing party. The lien provided for in this Section shall be in favor of the Association. The Association, acting on behalf of the Owners, shall have the power to bid the amount of its judgment at the judicial sale of any foreclosure proceeding and to acquire and hold, lease, mortgage and convey the lot. Upon the filing of such lien, all Assessments for the entire calendar year in which the lien is filed shall immediately become due and payable.

C. Owner's and Occupant's Obligations. Each Owner, by acquisition of an interest in a lot within the Property, hereby expressly vests in the Association the right and power to bring all actions against such Owner personally for the collection of such Assessments as may accrue while such Owner has owned the lot and to enforce the aforesaid by all methods available for the enforcement of such liens, including foreclosures, by an action brought in the name of the Association, similar to a mortgage lien on real property, and such Owner hereby expressly grants to the Association a power of sale in connection with such lien. No Owner may waive or otherwise escape liability for the Assessments provided for herein by abandonment of his lot. Furthermore, each occupant of the premises who lives in the Home on a lot within the Property during a period in which the Owner is absent therefrom shall be liable to the same extent as an Owner for the payment of Assessments for period of such occupation, and by such occupancy, said occupant covenants and agrees to pay the Assessments by the Association against the lot on a *pro rata* basis for the period of the occupancy; provided, however, in order to collect the Assessments due for a lot from the occupant who is not an Owner, the Association must give notice to the occupant that Assessments are unpaid by the Owner and that the Association intends collect the unpaid Assessments from the occupant for the period of the occupancy by said occupant after the receipt of said notice. The Association shall have the right to take such action and collect all sums against said occupant as the Association may take and collect against an Owner for unpaid Assessments.

**Section 8. Certificate of Payment.** The Treasurer of the Association, upon demand of any Owner liable for Assessments, shall furnish to such Owner a certificate in writing signed by such Treasurer setting forth whether such Assessments have been paid.

**Section 9. Membership.** Every Owner of a lot in the Property shall be a Member of the Association. Membership shall be appurtenant to and may not be separated from the title to any lot, except as provided herein. Owners in Phase III and Tract A-1 shall not be Members of the Association.

A. **Termination of Ownership Status.** Rights to a membership and status as a Member terminate upon termination of status as an Owner. Upon sale, conveyance or assignment of the Owner's interest in such Owner's lot or House, the selling or conveying Owner or Owners shall not be liable for any assessments levied from and after the date of such sale; provided, however, that no such sale or assignment shall relieve an Owner of liability arising prior to the date such sale or assignment is consummated. Acceptance by a purchaser or assignee of such sale or assignment evidences such purchaser's or assignee's assumption of personal liability for all assessments arising from and after the date such sale or assignment is consummated. A sale or assignment of an Owner's interest shall be deemed to have occurred for all purposes of this Consolidated Declaration upon the recording in the Records of the Santa Fe County Clerk of an instrument of conveyance of such interest.

B. **No Avoidance by Non-Use.** No Owner may avoid the obligations of membership during the period of ownership by non-use of the Common Areas, renunciation or abandonment of such Owner's lot or House, or any other act of abandonment or renunciation.

**Section 10. Voting Rights.** Members shall have the voting rights contained in this Section. There shall be two classes of voting membership:

A. **Class A.** Class A Members shall be all owners of lots in the Property with the exception of Declarant as identified in this Consolidated Declaration while the Declarant is a Class B Member. Class A Members shall be entitled to one vote for each lot owned in the Property. When more than one person holds an interest in any lot, other than as security for the performance of an obligation, all such persons shall be Members. The vote for such lot shall be exercised as they, among themselves, determine by written designation to the Association, but in no event shall more than one vote be cast with respect to any lot. The vote appurtenant to any lot shall be suspended in the event that, and for as long as, more than one Member holding an interest in that lot lawfully seeks to exercise it separate from the other Members holding an interest in any such lot.

B. **Class B.** The Class B Member shall be Declarant who shall be entitled to nine (9) votes for each unsold lot in Phases I, II, IV, V and VI. Lots in Phase III, Tract A-1 or Tesuque Creek shall not be factors in the determination of Declarant's Class B status. Class B membership shall cease when any six (6) of the following Lots are sold by the Declarant: Lots 60, 73, 74, 75, 76, 78, 79A-1, 79A-2, 80, 82, 84, 52A or 43, as such lots have been or may be amended from time to time, it being intended that Declarant shall retain control of the Association until it has conveyed such six (6) lots. When Class B membership ceases, Declarant shall become a Class A Member as to the remaining platted but unconveyed lots it owns.

## ARTICLE VI
### Owners' Rights and Limitations

CONSOLIDATED DECLARATION OF RESTRICTIVE COVENANTS SANTA FE SUMMIT 2009        Page 23

Case 12-01279-j   Doc 2   Filed 09/10/12   Entered 09/10/12 16:28:23 Page 23 of 32
Case 16-01018-sh   Doc 1   Filed 03/15/16   Entered 03/15/16 17:14:41 Page 30 of 54

Section 1. Owners' Easements of Enjoyment. Every Owner in the Subdivision shall have an easement of use and enjoyment in and to the Common Areas, which shall be appurtenant to and shall pass with the title to every lot, subject to the provisions of the Association's Articles of Incorporation, Bylaws, rules and regulations and the following rights which are expressly hereby granted.

A. The Association has the right to make Assessments and other fees for the maintenance of the Common Areas and the facilities and services provided to Owners as described herein.

B. The Association has the right to adopt rules and regulations governing the manner and extent of use of the Common Areas, and the personal conduct of the Owners and their guests thereon.

C. The Association has the right to suspend voting rights and the right to use of the Common Areas by an Owner for any period which any Assessment against his lot remains unpaid, without waiver of the Owner's obligation to pay the amount due, and for any other infraction of this Consolidated Declaration, the Association Bylaws, or the Association Rules and Regulations for the duration of the infraction and for an additional period not to exceed thirty (30) days; provided, however, the Association may not deny an Owner's right of ingress and egress to his lot.

D. The Association has the right to dedicate or transfer all or any part of the Common Areas, including, but not limited to the Roads, to any public agency, authority or utility (public or private) for such purposes and subject to such conditions as may be agreed upon by the Members of the Association. No such dedication or transfer shall be effective unless an instrument signed by the Members owning of seventy-five percent (75%) of the lots has been recorded.

E. The Association has the right, subject to the rights of the Owners set forth herein, to mortgage any or all of the facilities constructed on their respective lots for the purpose of improvements or repairs to such lot or facilities upon approval by one hundred percent of all Class B Members, if any, and seventy-five percent (75%) of the Class A Members at a regular meeting of the Association or at a special meeting called for that purpose.

F. The Declarant or the Association have the right to grant and reserve easements and rights-of-way through, under, over and across the Common Areas or through lots owned by Declarant for access or for the installation, maintenance and inspection of a Utility System and for drainage.

Section 2. Assignment of Rights to Tenant. Any Owner may lease his right of enjoyment to the Common Area and the facilities thereon to his tenant who resides in his House on the lot, subject to the provisions of this Consolidated Declaration, and the Association's Bylaws.

Section 3. Damage or Destruction of Common Areas by Owner. In the event any Common Area facilities or personal property of the Association or of Declarant are damaged or destroyed by an Owner or any of his guests, contractors, tenants, licensees, agents, employees or members of his family as a result of negligence or intentional acts, such Owner shall authorize the Association to repair the damage. Such repairs will be performed in a good and workmanlike manner in conformance with the original plans and specifications of the area involved or as the area may have been modified or altered

CONSOLIDATED DECLARATION OF RESTRICTIVE COVENANTS SANTA FE SUMMIT 2007    Page 24

Case 12-01279-j   Doc 2   Filed 09/10/12   Entered 09/10/12 16:28:23 Page 24 of 32
Case 16-01018-sh   Doc 1   Filed 03/15/16   Entered 03/15/16 17:14:41 Page 31 of 54

subsequently by the Association. The amount necessary for such repairs shall be the responsibility of such Owner and shall become a Lot Assessment.

Section 4. Title to Common Area.  Declarant has conveyed or will convey title to the Common Areas to the Association, subject to easements and restrictions of record, free from all liens, and subject to Declarant's right, after conveyance to the Association, to enter upon such Common Areas, for the purpose of construction of additional facilities, alteration of existing facilities, or creation of new easements or modifications of existing easements, or to exercise any other rights provided for elsewhere herein.

Section 5.  Maintenance of Roads, Sewer and Drainage Easements. The Association shall have the duty to maintain the Roads within the Subdivision and to maintain the sewer system and drainage structures within the Common Areas. The Association shall establish a schedule of maintenance for the Roads and drainage structures.

## ARTICLE VII
### Easements

Section 1. Easements. Declarant hereby reserves for itself, for the Association and its designees, a ten-foot (10') easement for the benefit of the Property upon, across, over, through, under, parallel and adjacent to each lot boundary line for ingress, egress, installation, replacement, repair and maintenance of the Utility System, for drainage and for services supplied by either Declarant or the Association. By virtue of this easement it shall be expressly permissible for Declarant and the Association to install and maintain facilities and equipment on the Property, to excavate for such purposes and to affix and maintain wires, circuits, pipes and conduits on and under the lots. This easement shall be perpetual in duration and in addition to, rather than in place of, any other recorded easements on the Property.

Section 2.  Declarant's Easement to Correct Drainage.  Declarant reserves for itself, for the Association and its designees, a blanket easement and right on, over and under the ground within the Property to maintain and to correct drainage of surface water and other erosion controls in order to maintain reasonable standards of health, safety and appearance. Such right expressly includes the right to cut any trees, bushes or shrubbery, make any grading of the soil, take up pavement, or to take any other similar action reasonably necessary, following which Declarant or the Association, as applicable, shall restore the affected Property to its original condition as nearly as practicable. Declarant or the Association shall give reasonable notice of intent to take such action to all affected Owners, unless in the opinion of Declarant or the Association an emergency exists which precludes such notice.  The right granted hereunder may be exercised at the sole option of Declarant or the Association and shall not be construed to obligate Declarant or the Association to take any affirmative action in connection therewith.

Section 3. Encroachment. To the extent that any improvements constructed by Declarant on or in any lot encroaches on any other lot or Common Area for any reason, a valid easement for such encroachment and the maintenance thereof shall exist.

Section 4. Declarant's Right to Grant Easement and Extend Utilities. Declarant hereby reserves the right to grant to certain, but not necessarily all, owners of properties developed by Declarant in the vicinity of but outside the Property ("nearby properties"), a nonexclusive easement and right to use any and all platted easements for ingress, egress, and utilities and to grant such easements for utilities through Association Property to other properties owned by Declarant, whether or not such easements

exist at the time of the recording of this Consolidated Declaration. Additionally, Declarant reserves the right to extend the water and sewer systems in the Property to serve such owners of nearby properties whether such systems are owned or not owned by the Association. Any such grant by the Declarant to such owners of nearby properties shall be subject to such conditions, limitations and obligations as Declarant, in the exercise of its sole and absolute discretion, shall determine, but at a minimum, these conditions shall include payment of its *pro rata* share of the cost of maintaining, replacing and repairing such easements and water and sewer systems, based on the number of lots served by, but not necessarily connected to, such systems.

Section 5. Duration of Easements. All easements reserved herein to Declarant shall be perpetual in duration.

## ARTICLE VIII
### General Provisions

Section 1. Duration. The covenants and restrictions contained in this Consolidated Declaration, as the same may be amended from time to time, shall run with and bind the Property and shall inure to the benefit of and be enforceable by the Declarant, the Association, or the Owners for a term of ninety-nine (99) years after the date that this Consolidated Declaration is recorded in the Records of the Santa Fe County Clerk, after which time all of said provisions shall be extended automatically for successive periods of ten (10) years each unless an instrument signed by seventy-five percent (75%) of all Class A Members and one hundred percent (100%) of all Class B Members, if any, shall have been recorded in the records of the Santa Fe County Clerk agreeing to terminate all of the said provisions as of a specified date, which instrument shall not be recorded earlier than ninety (90) days prior to the expiration of the term or extended term of this Consolidated Declaration. Unless this Consolidated Declaration is terminated in accordance with this Section, the Association shall re-record this Consolidated Declaration or other notice of its terms at intervals necessary under New Mexico law to preserve its effect.

Section 2. Condemnation. In the event all or part of the Common Areas owned by the Association shall be taken or condemned by any authority having the power of eminent domain, all compensation and damages shall be paid to the Association. The Board of Directors of the Association shall have the sole and exclusive right to act on behalf of the Association with respect to the negotiation and litigation of the taking or condemnation affecting such property. The Members may, by a vote of seventy five percent (75%) of all Class A Members and one hundred percent (100%) of all Class B Members, if any, agree to distribute the proceeds from any condemnation or taking by eminent domain among the Owners of the Property, but if the Members shall not so agree, such proceeds shall be added to the funds of the Association.

Section 3. Notices. Any notice required to be sent to the Owner of any lot under the provisions of this Consolidated Declaration shall be deemed to have been properly sent when mailed, first-class postage prepaid, or hand delivered to the last known address of the person who appears as Owner of such lot on the records of the Association at the time of such mailing. Owners have the responsibility of notifying the Association of any change in mailing address.

SFC CLERK RECORDED 07/28/2009

Section 4. Enforcement. In addition to the enforcement provisions previously set forth in this Consolidated Declaration, the provisions of this Consolidated Declaration may be enforced by any Owner, the Association, the Design Review Committee, or Declarant (as long as it holds any interest in the Property) by a proceeding at law or in equity against any person or entity violating or attempting to violate the same, either to restrain violation or to recover damages, or both, and against his or its property to enforce any lien created by this Consolidated Declaration; provided, however, only the Association can enforce the lien provision hereof and exercise the powers and duties expressly bestowed upon it herein. Failure to so enforce any of these protective covenants and restrictions shall in no event be deemed a waiver of the right to do so at any time thereafter.

Section 5. Interpretation. The provisions of this Consolidated Declaration shall be liberally construed to effectuate their purpose of creating a uniform consistent plan for the development and use of the Property.

Section 6. Invalidity. The invalidity of any part of this Consolidated Declaration shall not impair or affect in any manner the validity and enforceability of the balance of the Consolidated Declaration which shall remain in full force and effect.

Section 7. Gender and Number. The use of the masculine gender herein shall be deemed to include the feminine gender and the use of the singular shall be deemed to include the plural, whenever the context so requires.

Section 8. Amendment.

    A. Subject to the provisions of Article VIII, Section 9, Declarant specifically reserves the absolute and unconditional right, so long as it owns any of the Property, to amend this Consolidated Declaration without the consent or joinder of any party in such amendment for the purposes of

        i.    conforming to the requirements of the Federal Home Loan Mortgage Corporation, Federal National Mortgage Association or any other generally recognized institution involved in the purchase and sale of home loan mortgages, or

        ii.    conforming to the requirements of institutional mortgage lender(s) or title insurance company(s); or

        iii.    perfecting, clarifying or making internally consistent the provisions herein; or

        iv.    conforming to requirements of the City and / or County of Santa Fe for approval of the survey.

    B. Subject to the provisions of Article VIII, Section 9, Declarant reserves the right to amend this Consolidated Declaration for any other purpose than is specified in subparagraph A, Section 8, Article VIII, without the joinder of any party in such amendment until the termination of Class B membership so long as

        i.    the voting power of existing Members is not diluted thereby,

        ii.    the Assessments of existing Owners are not increased except as may be expressly provided for herein, and

Case 12-01279-j   Doc 2   Filed 09/10/12   Entered 09/10/12 16:28:23 Page 27 of 32
Case 16-01018-sh   Doc 1   Filed 03/15/16   Entered 03/15/16 17:14:41 Page 34 of 54

      iii.    no Owner's right to the use and enjoyment of his lot or the Common Areas is materially altered thereby.

C.   Except as provided above in subparagraphs A and B, Section 8, Article VIII, this Consolidated Declaration may only be amended at a duly called meeting of the Association where a quorum is present if the amendment resolution is adopted by seventy-five percent (75%) of all Class A Members and one hundred percent (100%) of all Class B Members, if any. An amendment so adopted shall be effective upon the recording in the records of the Santa Fe County Clerk of a copy of the amendment resolution, signed by the President of the Association and certified by the Secretary of the Association. In no event, no amendment shall be made to Article III, Section 1, Paragraph D hereof without the consent of the Declarant.

**Section 9. Consent of Mortgagees.** No amendment or modification of this Consolidated Declaration impairing the rights, priorities, remedies or interests of a Mortgagee shall be adopted without the prior written consent of all Mortgagees holding liens on the lots encumbered by Mortgages. Any such consent requested by Declarant of Mortgagees shall be given prompt consideration and shall not be unreasonably withheld. This Section shall not apply or be construed as a limitation upon those rights of Declarant, the Association or the Owners under this Consolidated Declaration to make amendments which do not impair Mortgagees' rights, priorities, remedies or interest in the Property. Any provision of this Consolidation Declaration that differs from the Original Declarations shall not be enforceable or binding upon any Mortgagee to the extent and to the degree that such provision impairs the rights, priorities, remedies or interests of such Mortgagee.

**Section 10. Legal Fees.** Any and all legal fees, including but not limited to attorneys' fees and court costs, including any appeals, which may be incurred by the Association in the lawful enforcement of any of the provisions of this Consolidated Declaration, regardless of whether such enforcement requires judicial action, shall be assessed against and collectible from the unsuccessful party to the action, and if an Owner, shall be a lien against such Owner's lot in favor of the Association.

**Section 11. Action Without Meeting.** Any action required to be taken hereunder by vote or assent of the Members may be taken in the absence of meeting by obtaining the written approval of the requisite number of Members. Any action so approved shall have the same effect as though taken at a meeting of the Members, and such approval shall be duly filed in the minute book of the Association.

**Section 12. Law to Govern.** This Consolidated Declaration shall be construed in accordance with the laws of the State of New Mexico, both substantive and remedial.

**Section 13. Use of Name.** Declarant, for itself, and those of its successors and assigns as are so designated by Declarant, hereby reserves the right to use the name "Santa Fe Summit" or any combination of such words in the promotion, marketing, development and sale of other properties. No proprietary right to such name is hereby granted to any Owner or to the Association.

**Section 14. Successors and Assigns of Declarant.** All rights and privileges herein conferred upon the Declarant shall be exercisable by such successor in title as is designated by Declarant.

CONSOLIDATED DECLARATION OF RESTRICTIVE COVENANTS SANTA FE SUMMIT 2007      Page 28

Case 12-01279-j   Doc 2   Filed 09/10/12   Entered 09/10/12 16:28:23 Page 28 of 32
Case 16-01018-sh   Doc 1   Filed 03/15/16   Entered 03/15/16 17:14:41 Page 35 of 54

**IN WITNESS WHEREOF,** the undersigned, being the Declarant herein, does hereby make this Consolidated Declaration of Restrictions, Covenants and Conditions for and has caused this Consolidated Declaration to be executed in its name on the day and year first above written.

RALPH L. BRUTSCHE REVOCABLE TRUST,
UTA Dated 9/21/89

By: _Ralph L. Brutsche_

Ralph L. Brutsche, Individually and as Trustee


NORTH HILL DEVELOPMENT Co.,
A NEW MEXICO CORPORATION

By: _Ralph L. Brutsche_

Ralph L. Brutsche, President


SUMMIT PROPERTIES, INC.,
A NEW MEXICO CORPORATION

By: _Ralph L. Brutsche_

Ralph L. Brutsche, President


CONSENTED TO BY
SANTA FE SUMMIT HOMEOWNERS' ASSOCIATION

By: _Kent Hoffman_

Kent Hoffman, President




DECLARATION COVENANTS
PAGES: 31

COUNTY OF SANTA FE )
STATE OF NEW MEXICO ) ss

I Hereby Certify That This Instrument Was Filed for Record On The 9TH Day Of July, 2009 at 02:06:12 PM And Was Duly Recorded as Instrument # 1569869 Of The Records Of Santa Fe County

Witness My Hand And Seal Of Office
Valerie Espinoza
Deputy _____ County Clerk, Santa Fe, NM

CONSOLIDATED DECLARATION OF RESTRICTIVE COVENANTS SANTA FE SUMMIT 2009          Page 29

**ACKNOWLEDGMENT**

STATE OF NEW MEXICO )
                    ) ss.
COUNTY OF SANTA FE )

On this _9th_ day of _July_, 200_9_, before me personally appeared Ralph L. Burtsche, individually, and as Trustee of the Ralph L. Brutsche Revocable Trust, UTA dated 9/21/89, as President of North Hill Development Company, a New Mexico corporation, and as President of Summit Properties, Inc., a New Mexico corporation, and personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the foregoing Consolidated Declaration of Covenants and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person and the entities upon behalf of which he acted executed the instrument.

Witness my hand and official seal.

Signature of Notary Public.

OFFICIAL SEAL
Magdalena P. Babuljak
Printed Name of Notary Public
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires

My Commission Expires: _04.25.2011_

**ACKNOWLEDGMENT**

STATE OF NEW MEXICO )
                    ) ss.
COUNTY OF SANTA FE )

On this _9th_ day of _July_, 200_9_, before me personally appeared Kent Hoffman, President of the Santa Fe Summit Homeowners' Association, a New Mexico corporation, and personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the foregoing Consolidated Declaration of Covenants and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the entity upon behalf of which he acted executed the instrument.

Witness my hand and official seal.

Signature of Notary Public.

OFFICIAL SEAL
Magdalena P. Babuljak
Printed Name of Notary Public
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires

My Commission Expires: _04.25.2011_

Case 12-01279-j   Doc 2   Filed 09/10/12   Entered 09/10/12 16:28:23 Page 30 of 37
Case 16-01018-sh   Doc 1   Filed 03/15/16   Entered 03/15/16 17:14:41 Page 37 of 54

*WARRANTY DEED*

Ralph L. Brutsche, a married man, for consideration paid, grants to Janice A. Brutsche, his

wife, as her sole and separate property, whose address is P. O. Box 1828, Santa Fe, New Mexico

87504, the real property described in Exhibit A, attached hereto and incorporated herein by

reference.

SUBJECT TO taxes for 2010 and thereafter, and subject to easements reservations and

restrictions of record with warranty covenants.

In witness whereof, the undersigned executed this instrument on this 20th day of April, 2010

*Ralph L. Brutsche*
Ralph L. Brutsche

*ACKNOWLEDGMENT*

STATE OF NEW MEXICO )
                     )  ss.
COUNTY OF SANTA FE   )

The foregoing instrument was acknowledged before me this 20th day of April, 2010, by
Ralph L. Brutsche.

*Karl H. Sommer*
Notary Public

My commission expires:

3/3/11

COUNTY OF SANTA FE    )          WARRANTY DEED
STATE OF NEW MEXICO   ) ss       PAGES: 2
I Hereby Certify That This Instrument Was Filed for
Record On The 11TH Day Of May, 2010 at 04:14:38 PM
And Was Duly Recorded as Instrument # 1598545
Of The Records Of Santa Fe County
          Witness My Hand And Seal Of Office
                         Valerie Espinoza
Deputy _____ County Clerk, Santa Fe, NM

**EXHIBIT**
B

SFC CLERK RECORDED 05/11/2010

*EXHIBIT A*

to Warranty Deed

*Legal Descriptions:*

**Lot 52A**, Santa Fe Summit, Phase IV, as shown and depicted on that certain plat of survey recorded in the records of the Santa Fe County Clerk in Plat Book 455, Page 009.

**Lots 60** and **78**, Santa Fe Summit, Phase VI, as shown and depicted on that certain plat of survey recorded in the records of the Santa Fe County Clerk in Plat Book 333, Pages 029 through 034.

**Lots 75-A** and **76-A**, Santa Fe Summit, Phase VI, as shown and depicted on that certain plat of survey recorded in the records of the Santa Fe County Clerk in Plat Book 521, Pages 015;

**Lots 79-A1** and **79-A2**, Santa Fe Summit, Phase VI, as shown and depicted on that certain plat of survey recorded in the records of the Santa Fe County Clerk in Plat Book 516, Page 001.

**Lots 80A** and **84-A**, Santa Fe Summit, Phase VI, as shown and depicted on that certain plat of survey recorded in the records of the Santa Fe County Clerk in Plat Book 513, Page 019.

**Lot 82-A**, Santa Fe Summit, Phase VI, as shown and depicted on that certain plat of survey recorded in the records of the Santa Fe County Clerk in Plat Book 514, Page 037.

BOOK No. 2219 PAGE No. 977 AS RECEPTION No. 1225,781
-2220 -007
THE SANTA FE SUMMIT SUBDIVISION (Phases 4, 5 & 6) DISCLOSURE STATEMENT WHICH PERTAINS TO LOTS 79-A1 AND 79-A2 IS RECORDED IN THE OFFICE OF THE SANTA FE COUNTY CLERK, N.M. IN BOOK No. 1410 PAGE No. 320 AS RECEPTION No. 946,742

00'

ENCE

UBDIVISION / LOT LINE
ON & SANTA FE SUMMIT
P.S. No. 13839, DATED
PAGE 977-007, AS
TY CLERKS OFFICE, N.M.

D AS NOTED.
.S. No. 13839.
SET.
TARY

| BRG. & DIST. | |
|---|---|
| 1"E | 16.68' |
| 7"W | 48.24' |
| 1"W | 28.66' |
| 7"W | 49.75' |
| 0"W | 20.54' |
| 4"E | 27.58' |
| "W | 68.96' |
| 3"W | 7.67' |
| 0"W | 24.76' |
| 8"W | 31.75' |
| "W | 41.91' |
| "W | 8.31' |
| 0"E | 45.05' |
| "E | 35.98' |

URVEY ON WHICH IT
ERSONAL DIRECTION
REON IS TRUE AND
MEETS OR EXCEEDS
FOR LAND SURVEYS
O STATE BOARD OF
AND SURVEYORS

PAUL A. RODRIGUEZ
NEW MEXICO
13839

U.S. GENERAL LAND OFFICE SURVEY
T17N, R10E
S.5 S.4
S.8 S.9
1926
Section 5
Section 8
Section 4
Section 9
N/F RALPH BRUTSCHE
LOT 13
BOOK 2219 PAGE 977 -2220 -007
S54°50'02"W TIE
27.54'
S85°12'13"E
121.38'
CAMINITO NEVADO
N/F RALPH BRUTSCHE
LOT 5
BOOK 2219 PAGE 977 -2220 -007
298.08'
N/F RALPH BRUTSCHE
LOT 12
BOOK 2219 PAGE 977-2220 007
91.26'
33.00' INGRESS, EGRESS AND UTILITY EASEMENT
BOOK 2219 PAGE 977 -2220 -007
Lot 3-A
0.670 Ac±
NET = 0.562 Ac.±
2642 CAMINITO NEVADO
S08°43'03"W
102.93'
OLD LOT LINE
33.00' INGRESS, EGRESS AND UTILITY EASEMENT
BOOK 2219 PAGE 977 -2220 -007
N23°48'47"E
30.12'
S82°15'12"E
N/F RALPH BRUTSCHE
LOT 11
BOOK 2219 PAGE 977 -2220 -007
319.20'
Lot 2-A
0.691 Ac±
NET = 0.594 Ac.±
2632 CAMINITO NEVADO
102.93'
S86°02'12"E
24.81'
146.11'
39.87'
S79°18'48"E
N/F RALPH BRUTSCHE
LOT 10
N/F RALPH BRUTSCHE
LOT 9
106.22'
N20°46'38"E
292.76'
Lot 1-A
0.683 Ac±
NET = 0.591 Ac.±
2622 CAMINITO NEVADO
141.77'
127.01'
N76°23'47"W
Lot 79-A1
0.250 Ac±
NET = 0.205 Ac.±
1411 TESUQUE CREEK RD.
S74°10'16"E
112.01'
347.63'
115.33'
227.34'
N/F RALPH BRUTSCHE
TRACT B
CONSERVATION EASEMENT
BOOK ___ PAGE ___
LOT 82-A
231.28'
Lot 79-A2
0.651 Ac±
NET = 0.561 Ac.±
1417 TESUQUE CREEK RD.
71.42'
S41°39'59"W
TESUQUE CREEK SUBDIVISION
SANTA FE SUMMIT SUBDIVISION
PHASE 4, 5 AND 6
TESUQUE CREEK ROAD
101.86'
15.0' DRAINAGE ESMT.
S82°00'00"W
156.19'
LOT 81
N/F RALPH BRUTSCHE
TRACT C
OPEN SPACE
BOOK 333 PAGE 031
TESUQUE CREEK ROAD
38.0' INGRESS, EGRESS & UTILITY EASEMENT
101.70'
N42°02'01"W
201.84'
LOT 80
PRIVATE PEDESTRIAN TRAIL EASEMENT
BK. 333 PG. 031
12'±
MAGNETIC NORTH
SCALE 1" = 40'
0' 20' 40' 80' 100' 120'

AND PROPRIETORS...
PLATTING JURISDICTION
MEXICO. MAINTENANCE (
IS TO BE THE RESPONS
IS HEREBY GRANTED

RALPH L. BRUTSCHE
President, North Hill
and Owner R J Propert

JANICE BRUTSCHE
R J Property Holding.

STATE OF NEW MEXIC
COUNTY OF SANTA F

ON THIS 2 DAY OF
WAS ACKNOWLEDGED BE
APPEAR ABOVE.

NOTARY PUBLIC

## SANTA FE C

COUNTY LAND USE A

02-3227
COUNTY DEVELOPMEN

COUNTY RURAL ADDR

## NOTES AND

ACCORDING TO F.E.M.A
PANEL No. 350069 017
FLOOD ZONE X, AREAS
FLOOD PLAIN.

SANTA FE COUNTY'S A
INCLUDE THE CONSTR
ROAD(S) AS SHOWN. PR
EASEMENT(S) OR ROAL
DEVELOPMENT PERMIT
THE SANTA FE COUNT

THE APPROVAL OF THIS
OF ANY FURTHER DEVE

EXISTING NATURAL DRA
PEDED WITHOUT THE W
ISTRATOR OR COUNTY
IMPEDE HISTORIC FLOW.

THESE LOTS ARE SUBJ
IMPACT FEES AT THE

LOTS 79-A1 AND 79-A
AND NOTES LISTED FOR
FE SUMMIT, RECORDED
No. 944,040, IN THE SA

LOTS 1-A, 2-A AND 3-
AND NOTES LISTED FO
IN BOOK 514 PA
1228-344, IN

MAINTENANCE OF ACCE
STRUCTURES IS THE
ASSOCIATION FOR EA

LOTS 79-A1 AND 79-
DIVISION, PHASE 4, 5
THE TESUQUE CREEK

123
COUNTY OF S
STATE OF NEV
I hereby certif
for record on
20 02 of
and was duly
page 001
Santa Fe Coun
Witness my
Reb
County Cler

August 7, 2010

## MEMORANDUM

To –   Janice Schaefer Brutsche

From – Ralph Brutsche

Dear Janice –

      I don't know how formal this document needs to be. We can ask Kurt or Karl Sommer.

      But, we agree, with the conveyance by me to you of the 10 lots – 52A, 60, 75, 76, 78, 79, 79A, 80, 82 and 84 – located in various Phases of Santa Fe Summit, I am, as Declarant, under the Consolidated Declaration of Restrictive Covenants for Santa Fe Summit, Phases I, II, IV, V, VI and Tesuque Creek , hereby designating you a Declarant and my successor in title – as provided under Section 14 of the Covenants.

      You become the Class B Member with the voting rights conferred under Section 10 of the Covenants. Also, Janice, you are excused from paying <u>any</u> assessment on <u>any</u> lot you own – see Section 2, page 20 of the Covenants.

      As owner of the common areas in the Development, I remain a Declarant and you hereby designate me (Ralph Brutsche) your representative for the handling of matters related to Association Covenants and dealings with both the Association Board and Association owners.

Agreed and signed this 7th day of August, 2010 by

_Janice Schaefer Brutsche_ (signature)    _Ralph L. Brutsche_ (signature)

Janice Schaefer Brutsche       Ralph L. Brutsche

**EXHIBIT**

C

tabbies

## AGREEMENT

This is an agreement ("Agreement") between Ralph L. Brutsche, individually and as Trustee of the Ralph L. Brutsche Trust u/t/a/d 11-24-89, as amended (collectively, "Ralph") and Janice Brutsche ("Janice"). The parties are husband and wife and own certain community property and each party has his or her own separate property and separate debts. In particular, the parties' residence and policies of insurance on Ralph's life, are each agreed to be community property. Ralph's interest in Amusing Investments, LLC, and the real estate developments in Santa Fe County, New Mexico, known as "Santa Fe Summit" and "Tesuque Creek" are agreed to be Ralph's separate property. Ralph's membership interest in R.J. Property Holdings, LLC, a New Mexico limited liability company, ("R.J.") is agreed to be Ralph's separate property and Janice's membership interest in R.J. is agreed to be Janice's separate property.

1.     Ralph borrowed five hundred thousand dollars ($500,000) on a home equity loan secured by a mortgage on the parties' residence and used four hundred fifty thousand dollars ($450,000) of the loan proceeds to pay off debt owed by Amusing Investments, LLC.

2.     The parties received one hundred fifty thousand dollars ($150,000) in settlement of an insurance claim related to their community residence at 1436 Old Sunset Trail, all of which was used by Ralph to pay his separate debts.

3.     Janice loaned Ralph one hundred nineteen thousand dollars ($119,000), which was repaid with proceeds of a loan against a policy of insurance on Ralph's life, of which Janice is the sole beneficiary. Ralph also borrowed another three hundred forty thousand dollars ($340,000) against policies of insurance on his life of which Janice is the sole beneficiary.

4.     In consideration of Janice's agreement that Ralph could pledge the community property residence and the community property life insurance policies to secure his separate debts, and Ralph's receipt of the proceeds of the insurance claim related to the community property residence and use of those proceeds to pay separate debts, Ralph hereby assigns, transfers and conveys to Janice, as her sole and separate property his entire membership interest in R.J. Ralph's conveyance of the membership interest shall be documented in an Assignment of Membership Interest in the form attached as Exhibit A.

5.     In consideration of Ralph's assignment to her of the membership interest in R.J. described in the preceding paragraph, Janice hereby fully and finally releases, acquits, and forever discharges any and all claims she may have, now or in the future, against Ralph,



EXHIBIT
D

individually or as trustee of the trust described above, arising out of or pertaining to the transactions described in paragraphs 1, 2, 3 and 4, above, whether based on contract or tort or any other legal theory.

6. If the provisions of either paragraph 5 or paragraph 6, above, are in any material respect determined by a court of competent jurisdiction to be unenforceable or subject to avoidance, then this Agreement shall be null and void *ab initio* and the parties shall take such action as may be necessary to restore each party to substantially the same position he or she occupied prior to execution and consummation of this Agreement.

7. This is a complete statement of the agreement of the parties with respect to the matters described above. There are no other understandings or agreements with respect to the matters described above that are not set out in this Agreement and all prior discussions and negotiations and any prior understandings, written or oral, are merged into this Agreement. This Agreement may not be altered or amended except by a writing signed by each of the parties.

In witness whereof, the parties have executed this Agreement as of the _2nd_ day of December, 2010.

Ralph L. Brutsche

Ralph L. Brutsche, Trustee of the
Ralph L. Brutsche Trust u/t/a/d
11-24-89, as amended

Janice Brutsche

2

## AGREEMENT

This is an agreement ("Agreement") between Ralph L. Brutsche, individually and as Trustee of the Ralph L. Brutsche Trust u/t/a/d 11-24-89, as amended (collectively, "Ralph") and Janice Brutsche ("Janice"). The parties are husband and wife and own certain community property and each party has his or her own separate property and separate debts. In particular, the parties' residence and policies of insurance on Ralph's life, are each agreed to be community property. Ralph's interest in Amusing Investments, LLC, and the real estate developments in Santa Fe County, New Mexico, known as "Santa Fe Summit" and "Tesuque Creek" are agreed to be Ralph's separate property. Ralph's membership interest in R.J. Property Holdings, LLC, a New Mexico limited liability company, ("R.J.") is agreed to be Ralph's separate property and Janice's membership interest in R.J. is agreed to be Janice's separate property.

1.    Ralph borrowed five hundred thousand dollars ($500,000) on a home equity loan secured by a mortgage on the parties' residence and used four hundred fifty thousand dollars ($450,000) of the loan proceeds to pay off debt owed by Amusing Investments, LLC.

2.    The parties received one hundred fifty thousand dollars ($150,000) in settlement of an insurance claim related to their community residence at 1436 Old Sunset Trail, all of which was used by Ralph to pay his separate debts.

3.    Janice loaned Ralph one hundred nineteen thousand dollars ($119,000), which was repaid with proceeds of a loan against a policy of insurance on Ralph's life, of which Janice is the sole beneficiary. Ralph also borrowed another three hundred forty thousand dollars ($340,000) against policies of insurance on his life of which Janice is the sole beneficiary. Ralph is not paying the interest on the insurance policy loans in cash. The amount of the loans, including interest, reduces the benefits payable to Janice.

4.    Janice paid all of the 20____ property taxes on the land owned by R.J.

5.    In consideration of Janice's agreement to Ralph's pledge of the community property residence and the community property life insurance policies to secure or pay his separate debts, and Ralph's receipt of the proceeds of the insurance claim related to the community property residence and use of those proceeds to pay separate debts, and Janice's payment of R.J.'s property taxes, Ralph hereby assigns, transfers and conveys to Janice, as her sole and separate property his entire membership interest in R.J. Ralph's conveyance of the

EXHIBIT

E

membership interest shall be documented in an Assignment of Membership Interest in the form attached as Exhibit A.

6.      In consideration of Ralph's assignment to her of the membership interest in R.J. described in the preceding paragraph, Janice hereby fully and finally releases, acquits, and forever discharges any and all claims she may have, now or in the future, against Ralph, individually and as trustee of the Ralph L. Brutsche Trust, his personal representative, heirs, successors and assigns, arising out of or pertaining to the transactions described in paragraphs 1, 2, 3 and 4, above, whether based on contract or tort or any other legal theory.

7.      If the provisions of either paragraph 5 or paragraph 6, above, are in any material respect determined by a court of competent jurisdiction to be unenforceable or subject to avoidance, then this Agreement, including paragraph 6, shall be null and void *ab initio* and the parties shall take such action as may be necessary to restore each party to substantially the same position he or she occupied prior to execution and consummation of this Agreement.

8.      This is a complete statement of the agreement of the parties with respect to the matters described above. There are no other understandings or agreements with respect to the matters described above that are not set out in this Agreement and all prior discussions and negotiations and any prior understandings, written or oral, are merged into this Agreement. This Agreement may not be altered or amended except by a writing signed by each of the parties.

In witness whereof, the parties have executed this Agreement as of the _____ day of January, 2011.


_____                   _____
Ralph L. Brutsche                                   Ralph L. Brutsche, Trustee of the
                                                    Ralph L. Brutsche Trust u/t/a/d
                                                    11-24-89, as amended


_____
Janice Brutsche

COT3

## WARRANTY DEED

Ralph L. Brutsche, a married man dealing in his sole and separate property,
joined proforma by his wife, Janice Brutsche _____ for consideration paid, grant___

@ R. J. Property Holdings, LLC, a New Mexico limited liability company _____

whose address is  PO Box 1828, Santa Fe, NM 87504 _____ **1732905**

the following described real estate in _____ Santa Fe _____ County, New Mexico:
Lots 50, 54, 77, 78, 79, 80, 81, 82, 83, and 84, as shown and delineated on that
certain plat of survey entitled "Subdivision Plat Phases 4, 5 and 6 Santa Fe Summit,
Sections 8 and 9, T. 17 N., R. 10 E., N.M.P.M., Santa Fe County, New Mexico",
prepared by Guy D. Hayden NMPS #4070, filed May 2, 1996 as Document No. 944,040 and
recorded in Plat Book 333, Pages 029-034, in the records of Santa Fe County, New
Mexico.

SUBJECT TO:  Reservations, restrictions and easements of record and to property taxes
for 1999 and thereafter.

THIS DEED IS GIVEN TO CORRECT THE GRANTEE'S NAME IN THAT CERTAIN DEED FROM RALPH L.
BRUTSCHE, A MARRIED MAN DEALING IN HIS SOLE AND SEPARATE PROPERTY, JOINED PROFORMA BY
JANICE BRUTSCHE, TO R.J. INVESTMENTS, LLC, A NEW MEXICO LIMITED LIABILITY COMPANY,
DATED JANUARY 1, 1999, RECORDED IN BOOK 1722, PAGE 494, IN THE RECORDS OF SANTA FE
COUNTY, NEW MEXICO.

COUNTY OF SANTA FE } ss 207
STATE OF NEW MEXICO } 1105
I hereby certify that this instrument was filed
for record on the ___ day of Feb A.D.,
20 ___, at ___ o'clock ___ m.
and was duly recorded in book ___
page ___ of the records of
Santa Fe County,
Witness my Hand and Seal of Office
Rebecca Bustamante
County Clerk, Santa Fe County, N.M.
_____
Deputy

with warranty covenants.

WITNESS our  hand s  and seal s  this  1  day of  January , 1999

_____ (Seal)      Ralph L. Brutsche (Seal)
                                        Ralph L. Brutsche

_____ (Seal)      Janice Brutsche (Seal)
                                        Janice Brutsche

### ACKNOWLEDGMENT FOR NATURAL PERSONS

STATE OF NEW MEXICO } ss.
COUNTY OF  Santa Fe
This instrument was acknowledged before me on  January  Feb 1 , 2000
by  Ralph L. Brutsche and Janice Brutsche

OFFICIAL SEAL
Diana Pollard
NOTARY PUBLIC
My Commission expires:               _____
(Seal)                                Notary Public

### ACKNOWLEDGMENT FOR CORPORATION

STATE OF NEW MEXICO }
COUNTY OF _____ } ss.
This instrument was acknowledged before me on _____
_____ (date)
by _____
         (Name of Official)
of _____
(Title of Officer)    (Name of Corporation Acknowledging)
a _____ corporation, on behalf of said corporation.

My commission expires:
(Seal)                                _____
                                      Notary Public

For Recorder's Use Only

CERTIFIED A TRUE AND CORRECT COPY
OF Warranty Deed
RECORDED ON Feb 3 2000
AS INSTRUMENT NO. 1732905
GERALDINE SALAZAR
SANTA FE COUNTY CLERK
BY _____ Deputy

EXHIBIT



IT IS ORDERED

Date Entered on Docket: 10/22/2015

The Honorable Sarah A. Hall
United States Bankruptcy Judge

---

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re: Ralph Leo Brutsche, SSN xxx-xx-6754,
      Debtor.

Case No. 7-11-13326-SH

---

Yvette Gonzales, Chapter 7 Trustee,

     Plaintiff

vs.

Adv. No. 13-01046-SH

Janice A. Brutsche a/k/a Janice Schaefer Brutsche
a/k/a Janice Schaeffer,

      Defendant.

**STIPULATED JUDGMENT AVOIDING TRANSFERS IN
ADVERSARY CASE AGAINST DEFENDANT JANICE A. BRUTSCHE**

This matter comes before the Court on the stipulation of the Plaintiff Yvette J. Gonzales, in her capacity as Chapter 7 Trustee ("Trustee") and Defendant Janice A. Brutsche a/k/a Janice Schaefer Brutsche a/k/a Janice Schaeffer ("J. Brutsche"). The Court, being fully advised in the premises hereby FINDS:

**EXHIBIT**

F

1. This adversary proceeding was commenced on June 4, 2013 by the filing of Plaintiff's Complaint for Avoidance of Transfers Under 11 U.S.C. §547, 548, 544, and for Post Petition Transfers under 11 U.S.C. § 549(a)(B). (Doc. No. 1).

2. The Court has jurisdiction over this adversary proceeding under 28 USC Section 1334 and 28 USC Section 157. This is a core proceeding.

3. The Trustee and J. Brutsche have resolved their differences, and stipulate and agree that the transfers to J. Brutsche described on Exhibit "1" will be avoided and preserved for the Estate.

4. The stipulation between the Trustee and J. Brutsche should be approved.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that:

The stipulation between the Plaintiff and J. Brutsche is approved, and judgment is entered avoiding the property transfers in this adversary case, described on Exhibit "1", attached hereto, and such transfers are preserved for the benefit of the Estate.


###END OF ORDER###

Submitted by:

s/ George D. Giddens, Jr., submitted electronically 10/15/15
George D Giddens, Jr
10400 Academy Rd NE Ste 350
Albuquerque, NM 87111-1229
505-271-1053
505-271-4848 (fax)
*Attorneys for Chapter 7 Trustee*

Approved:

S/ Bonnie Bassan, *Email Approval on October 13, 2015*
Bonnie Bassan
George M. Moore
Moore, Berkson, Bassan & Behles, P.C.
3800 Osuna NE, Suite 2
Albuquerque, NM 87109
505-242-1218
505-242-2836 (fax)
*Attorneys for Defendant Janice Brutsche*

## Exhibit 1

The following deeds or transactions are avoided:

1. Warranty Deed from Ralph L. Brutsche to Janice A. Brutsche recorded on May 11, 2010 of the following lots, which were attached as Exhibit 1 to the Warranty Deed: Lot 52A, 60, 76, 76-A, 78-A, 79-A1, 79-A2, 80A, 84-A, and 82-A.

2. Ralph Brutsche's Assignment of Membership Interest of his 99 interest in RJ Property to Janice Brutsche on December 2, 2010 and January 2011, copies of which are attached hereto.

3. Warranty Deed from Ralph L. Brutsche to Janice A Brutsche for conveyance of one half separate interest in Lot 52-A recorded on May 11, 2010

## ASSIGNMENT OF MEMBERSHIP INTEREST

Ralph L. Brutsche, as Trustee of the Ralph L. Brutsche Revocable Trust u/t/a/d 11-24-89 ("Trust"), as amended, in consideration of Janice Brutsche's allowing Ralph L. Brutsche to borrow the sum of $750,000.00 on their personal residence and obligating her interest in the residence for this debt, hereby assigns, conveys, and transfers to Janice Brutsche, individually, as her sole and separate property, all of the Trust's right, title and interest, in and to the Trust's membership in R.J. Property Holdings, LLC, a New Mexico limited liability company (the "Company"). As of the date of this Assignment, the Trust shall have no further right to distributions made by the Company and shall have no rights or responsibilities as either a member-manager or as a member.

Dated: _Dec 2, 2010_

_Ralph L. Brutsche_
Ralph L. Brutsche as Trustee

Accepted:

_Janice Brutsche_
Janice Brutsche

Case 11-13326-sh7    Doc 604    Filed 04/06/15    Entered 04/06/15 13:37:55 Page 29 of 31
Case 16-01018-sh    Doc 1    Filed 03/15/16    Entered 03/15/16 17:14:41 Page 51 of 54
Case 13-01046-sh    Doc 35    Filed 10/22/15    Entered 10/22/15 13:33:25 Page 5 of 7

## AGREEMENT

This is an agreement ("Agreement") between Ralph L. Brutsche, individually and as Trustee of the Ralph L. Brutsche Trust u/t/a/d 11-24-89, as amended (collectively, "Ralph") and Janice Brutsche ("Janice"). The parties are husband and wife and own certain community property and each party has his or her own separate property and separate debts. In particular, the parties' residence and policies of insurance on Ralph's life, are each agreed to be community property. Ralph's interest in Amusing Investments, LLC, and the real estate developments in Santa Fe County, New Mexico, known as "Santa Fe Summit" and "Tesuque Creek" are agreed to be Ralph's separate property. Ralph's membership interest in R.J. Property Holdings, LLC, a New Mexico limited liability company, ("R.J.") is agreed to be Ralph's separate property and Janice's membership interest in R.J. is agreed to be Janice's separate property.

1.  Ralph borrowed five hundred thousand dollars ($500,000) on a home equity loan secured by a mortgage on the parties' residence and used four hundred fifty thousand dollars ($450,000) of the loan proceeds to pay off debt owed by Amusing Investments, LLC.

2.  The parties received one hundred fifty thousand dollars ($150,000) in settlement of an insurance claim related to their community residence at 1436 Old Sunset Trail, all of which was used by Ralph to pay his separate debts.

3.  Janice loaned Ralph one hundred nineteen thousand dollars ($119,000), which was repaid with proceeds of a loan against a policy of insurance on Ralph's life, of which Janice is the sole beneficiary. Ralph also borrowed another three hundred forty thousand dollars ($340,000) against policies of insurance on his life of which Janice is the sole beneficiary. Ralph is not paying the interest on the insurance policy loans in cash. The amount of the loans, including interest, reduces the benefits payable to Janice.

4.  Janice paid all of the 20___ property taxes on the land owned by R.J.

5.  In consideration of Janice's agreement to Ralph's pledge of the community property residence and the community property life insurance policies to secure or pay his separate debts, and Ralph's receipt of the proceeds of the insurance claim related to the community property residence and use of those proceeds to pay separate debts, and Janice's payment of R.J.'s property taxes, Ralph hereby assigns, transfers and conveys to Janice, as her sole and separate property his entire membership interest in R.J. Ralph's conveyance of the

Case 11-13326-sh7    Doc 604    Filed 04/06/15    Entered 04/06/15 13:37:55 Page 30 of 31
Case 16-01018-sh    Doc 1    Filed 03/15/16    Entered 03/15/16 17:14:41 Page 52 of 54
Case 13-01046-sh    Doc 35    Filed 10/22/15    Entered 10/22/15 13:33:25 Page 6 of 7

membership interest shall be documented in an Assignment of Membership Interest in the form attached as Exhibit A.

6.    In consideration of Ralph's assignment to her of the membership interest in R.J. described in the preceding paragraph, Janice hereby fully and finally releases, acquits, and forever discharges any and all claims she may have, now or in the future, against Ralph, individually and as trustee of the Ralph L. Brutsche Trust, his personal representative, heirs, successors and assigns, arising out of or pertaining to the transactions described in paragraphs 1, 2, 3 and 4, above, whether based on contract or tort or any other legal theory.

7.    If the provisions of either paragraph 5 or paragraph 6, above, are in any material respect determined by a court of competent jurisdiction to be unenforceable or subject to avoidance, then this Agreement, including paragraph 6, shall be null and void *ab initio* and the parties shall take such action as may be necessary to restore each party to substantially the same position he or she occupied prior to execution and consummation of this Agreement.

8.    This is a complete statement of the agreement of the parties with respect to the matters described above. There are no other understandings or agreements with respect to the matters described above that are not set out in this Agreement and all prior discussions and negotiations and any prior understandings, written or oral, are merged into this Agreement. This Agreement may not be altered or amended except by a writing signed by each of the parties.

In witness whereof, the parties have executed this Agreement as of the ___ day of January, 2011.


_Ralph L. Brutsche_ (signature)
Ralph L. Brutsche


_Ralph L. Brutsche_ (signature)
Ralph L. Brutsche, Trustee of the
Ralph L. Brutsche Trust u/t/a/d
11-24-89, as amended


_Janice Brutsche_ (signature)
Janice Brutsche


2

Case 11-13326-sh7    Doc 604    Filed 04/06/15    Entered 04/06/15 13:37:55 Page 31 of 31
Case 16-01018-sh    Doc 1    Filed 03/15/16    Entered 03/15/16 17:14:41 Page 53 of 54
Case 13-01046-sh    Doc 35    Filed 10/22/15    Entered 10/22/15 13:33:25 Page 7 of 7

# Notice Recipients

District/Off: 1084−1            User: phennessy            Date Created: 10/22/2015
Case: 13—01046—sh             Form ID: pdfor1            Total: 3

**Recipients of Notice of Electronic Filing:**
aty          Bonnie P. Bassan          mbglaw@swcp.com
aty          George D Giddens, Jr          dave@giddenslaw.com
aty          George M Moore          mbglaw@swcp.com

                                                                      TOTAL: 3